**The PEOPLE of the State of Colorado, Plaintiff–Appellant,**

v.

**In the Interest of J.D., Juvenile–Appellee,**

**and concerning D.S., Respondent– Appellee.**

**No. 99SA112.**

Supreme Court of Colorado, En Banc.

Nov. 29, 1999.

---

764

Mark T. Adams, District Attorney, Thirteenth Judicial District, Christian J. Schulte, Deputy District Attorney, Fort Morgan, Colorado, Attorneys for Plaintiff–Appellant.

Sara Allen, Fort Morgan, Colorado, Attorney for Juvenile–Appellee.

No appearance by or on behalf of Respondent–Appellee.

Justice SCOTT delivered the Opinion of the Court.

As a general rule, statements of a juvenile made in the course of a custodial interrogation are not admissible against the juvenile unless a parent is present during the interrogation and both the juvenile and parent are first advised of the juvenile's *Miranda* rights.[1] *See* § 19–2–511(1), 6 C.R.S. (1999); *In re Gault,* 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); *Nicholas v. People,* 973 P.2d 1213, 1222 (Colo.1999). In this case, the Morgan County District Court (trial court) ruled that the statements of a juvenile, J.D., made in the course of telephone conversations she initiated with the police, were not admissible. The trial court so ruled because it found that the statements made by J.D. arose out of a "custodial interrogation." Relying upon that determination, the trial court concluded that J.D. was entitled to but was not given her *Miranda* warnings nor the benefit of the presence of a parent.

On interlocutory review, we must decide whether the trial court erred when it suppressed J.D.'s statements. We conclude that the trial court did err. Under the totality of the circumstances standard, applying the factors announced in *People v. Denison,* 918 P.2d 1114 (Colo.1996), we conclude, as a matter of law, that the telephone interrogation of J.D., initiated at J.D.'s request while she was detained in a Nevada state juvenile facility, did not constitute a "*custodial* interrogation."

■■■ We hold that a trial court must consider the totality of the circumstances, including the four-factor "'restriction' standard" announced in *Denison,* when determining whether a juvenile detained in a state facility has been subjected to a custodial interrogation because she is not "free to leave." *See id.* at 1116. We also hold that the voluntary telephone statement of a juvenile should not be suppressed when given during the course of an encounter with police that does not amount to a "custodial interrogation," even if the juvenile's statement is made without the benefit of *Miranda* warnings. We further hold that because section 19–2–511 only covers statements that are made during a "custodial interrogation," J.D.'s statements may not be suppressed merely because they were made outside the presence of a parent. Accordingly, we reverse the ruling of the trial court and return this matter to that court for further proceedings consistent with this opinion.

### I.

This is an interlocutory appeal filed by the People (State) pursuant to C.A.R. 4.1 and section 16–12–102(2), 6 C.R.S. (1999). The facts of this case are not in dispute. We set forth those undisputed facts discussed in the trial court's ruling and found in the briefs of the parties and in the record before us.

### A.

On October 28, 1998, J.D., a juvenile,[2] was detained in Colorado by Fort Morgan police and transported to a state juvenile detention center in Stateline, Nevada. The Fort Morgan police detained J.D. solely in connection with a probation violation in Nevada. At that time, Detective Keith Kuretïch asked J.D. if she would answer questions regarding an armed robbery in Colorado. She refused. In response, Kuretich gave her his name and telephone number, in case she changed her mind and wanted to speak with him later.

On October 29, 1998, J.D. made a telephone call from the Nevada state detention facility to Kuretich in Fort Morgan. Because Kuretich was not available, J.D. left a message asking Kuretich to return her call.

The next morning, Kuretich returned J.D.'s telephone call and was able to speak directly to her. During the course of this conversation, J.D. told Kuretich that she wanted to talk with him about the armed robbery. In response, Kuretich told her that he would call again later and asked J.D. to make arrangements for someone she trusted to be present during their conversation.

1. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *People in the Interest of M.R.J.,* 633 P.2d 474 (Colo.1981).

2. The record indicates that J.D. was 16–years–old at the time of the interrogation.

After his conversation with J.D., Kuretich contacted J.D.'s mother. Kuretich provided her with a written *Miranda* warning and told her about J.D.'s telephone call to him. J.D.'s mother advised Kuretich that she knew J.D. wanted to talk to him and indicated her approval.

Later that same day, at about 2:00 p.m., Kuretich returned J.D.'s telephone call, as previously agreed, to allow J.D. to tell him about her participation in the armed robbery. Another detective, Nick Gardner joined Kuretich and listened through a speaker-phone. Presumably as Kuretich had suggested earlier, J.D. arranged for two adults to be present during their telephone conversation, Steve Hagen, J.D.'s Nevada probation officer, and June Foster, a detention officer at the Nevada facility.

The telephone conversation lasted approximately forty minutes. At the outset of the conversation, Kuretich offered to "do what [he could] to dismiss" the other charges against J.D. for "resisting arrest, obstructing and criminal mischief." Regarding the armed robbery, the trial court found Kuretich "assured" her that under Colorado law she could be charged as an adult, but if she cooperated, "there would be minimal or no charges brought"; that is, she would be charged as a juvenile, which would make a big difference. As the trial court characterized it, "[t]here was active encouragement directed by words toward the juvenile to cooperate and to give a full statement" and "the probation officer in Nevada was actively encouraging her to make a statement as he felt it would be in her interest to do that." J.D. then agreed to proceed, asking Kuretich, "Well[,] do you want to know what happened, or not?" J.D. then discussed details of the armed robbery, including the identities of participants and the weapon used, a shotgun. At the end of the telephone conversation, Kuretich thanked J.D. for her help, to which she replied, "You're welcome." Kuretich also told J.D., Hagen, and Foster that J.D.'s mother had "agreed to th[e] interview" earlier in the day.

Kuretich did not give J.D. her *Miranda* warnings at any time during the telephone conversation. At no time during the conversation about the robbery did J.D. ask to terminate their discussion or otherwise indicate any unwillingness to talk about her role in the subject robbery.

### B.

As a result of J.D.'s detailed statements describing her participation in the armed robbery, she was arrested. Consistent with Kuretich's "assur[ance]" at the beginning of the telephone conversation, J.D. was not charged as an adult. The State did, however, initiate delinquency proceedings against her for acts that would constitute felonies if they had been committed by an adult, including acts that would constitute aggravated armed robbery.[3]

On February 19, 1999, J.D. filed a motion to suppress the statements she made to Kuretich and Gardner. Specifically, J.D. claimed that her telephone statements should be suppressed because they were the products of a custodial interrogation conducted without the benefit of a *Miranda* warning. Moreover, J.D. argued that because she was interrogated outside the presence of a "parent, guardian, or legal or physical custodian," her statements could not be admitted in her delinquency proceedings in accordance with section 19–2–511(1), 6 C.R.S. (1999).[4] J.D.

---

3. *See* § 18–4–302(1)(b), 6 C.R.S. (1999). In addition, the State alleged that J.D. is a violent offender and an aggravated violent offender. *See* § 19–2–516(3), (4), 6 C.R.S. (1999) (authorizing increased commitment pursuant to section 19–2–601, 6 C.R.S. (1999)).

4. At the time she was questioned, section 19–2–511(1) provided in material respects:
 No statements or admissions of a juvenile made as a result of a custodial interrogation ... shall be admissible in evidence against such juvenile unless a parent, guardian, or legal or physical custodian of the juvenile was

present at such interrogation and the juvenile and his or her parent, guardian, or legal or physical custodian were advised of the juvenile's [constitutional rights].
 However, that statute was amended after our decision in *Nicholas v. People*, 973 P.2d 1213 (Colo.1999). The General Assembly amended subsection (2) of that statute to provide:
 Notwithstanding the provisions of subsection (1) of this section, statements or admissions of a juvenile may be admissible in evidence, notwithstanding the absence of a parent, guardian, or legal or physical custodian, if the court

also claimed that her statements should be suppressed because the officers made promises to her.

A brief motions hearing was held on February 26, 1999, at which only Detective Kuretich testified and, in accordance with the agreement of both parties, the transcript of the telephone conversation was admitted into evidence. During the motions hearing, the trial court inquired as to whether J.D. was "[i]nitially ... detained for [the robbery]?" Defense counsel replied, "That is correct, your Honor." In addition, the trial court asked whether "[t]here was an arrest warrant actually executed in the case." Defense counsel stated, "There was." However, J.D.'s motion to suppress states that she "was detained by the Fort Morgan [Colorado] [p]olice ... to transport her to the Douglas County Juvenile Detention Center in Stateline, Nevada, in connection with a probation violation in that jurisdiction." Kuretich testified that J.D.'s detention and transfer to Nevada authorities were *not* related to the robbery charges pending in Colorado.

On March 19, 1999, in open court, the trial court issued its ruling. The trial court suppressed the statements made by J.D., concluding that, under the "factors of particular significance" adopted in *People v. Denison*, and "look[ing] to the level of restriction involved as to an inmate," this was a custodial interrogation within the meaning of *Miranda* and within the meaning of 19–2–511. Thus, because J.D. was in a juvenile detention center at the time of the interrogation and under its application of the *Denison* factors, the trial court found that J.D. had been subjected to a custodial interrogation. The trial court further reasoned that J.D.'s statements were not only inadmissible because she was not given her *Miranda* warnings, but were also inadmissible because "no parent or parental figure [was] in attendance at the time of the interrogation," contrary to section 19–

2–511. The State timely filed this interlocutory appeal of the trial court's ruling.

## II.

The State claims the trial court erred when it concluded that J.D.'s statements were made in the course of "a custodial interrogation within the meaning of *Miranda* and within the meaning of [section] 19–2–511." The State further argues that the trial court erroneously concluded that because Kuretich failed to give a *Miranda* warning to J.D. and failed to interview her in the presence of a parent or adult, "it's necessary to exclude [J.D.'s] statements ... from the evidence presented at trial."

Before the trial court and here on appeal, the State argues that the totality of the circumstances standard is the correct standard to be applied to Kuretich's telephone conversation with J.D. Therefore, the State reasons that the crucial determination as to whether J.D. was "in custody" during the interrogation by Kuretich does not rise or fall based solely on the fact she was detained at the time of the interrogation. Applying that standard here, the State argues that as a matter of law, the telephone conversation could not constitute a "*custodial* interrogation." Hence, the State posits that the absence of *Miranda* warnings and the requirements of section 19–2–511(1) cannot stand as the basis for suppressing J.D.'s statements.

We agree. In light of the facts set forth on this record and applying the totality of the circumstances standard as set forth in *Denison* to assess J.D.'s freedom of movement within the Nevada detention facility, we conclude that J.D. was not subjected to a "*custodial* interrogation."

## A.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United

finds that, under the totality of the circumstances, the juvenile made a knowing, intelligent, and voluntary waiver of rights and: (I) The juvenile is eighteen years of age or older at the time of the interrogation or the juvenile misrepresents his or her age as being eighteen years of age or older and the law enforcement official acts in good faith reliance on such misrepresentation in conducting the interrogation; (II) The juvenile is emancipated from the parent, guardian, or legal or physical custodian; or (III) The juvenile is a runaway from a state other than Colorado and is of sufficient age and understanding.
§ 19–2–511(2). *Nicholas* was decided under the statute prior to the amendment; therefore, we need not and do not address the statute as recently amended.

States Supreme Court held that a suspect's statements made during a custodial interrogation are inadmissible unless the suspect received adequate advisement of his constitutional rights. *See People v. Jordan*, 891 P.2d 1010, 1014 (Colo.1995). "Before a *Miranda* advisement is required, the following two prerequisites must be satisfied: the person to whom the advisement is given must be in custody at the time of the advisement, and the statements being made by the person must be the product of a police interrogation." *People v. Dracon*, 884 P.2d 712, 716 (Colo.1994).

■■■ In determining whether an individual has been subjected to a custodial interrogation, the relevant inquiry is "whether a reasonable person in the suspect's position would consider herself deprived of her freedom of action in a significant way at the time of the interrogation." *Id.* at 716–17; *see also People v. Trujillo*, 785 P.2d 1290, 1293 (Colo. 1990). In arriving at this determination, a trial court must consider the totality of the circumstances surrounding the interrogation. *See Dracon*, 884 P.2d at 717. The totality of the circumstances test is also applicable to circumstances involving the rights of juveniles. *See* § 19–2–511(2); *see also People in the Interest of J.C.*, 844 P.2d 1185, 1189 (Colo.1993).

### B.

■■■ Under our totality of the circumstances standard, a person under detention or incarcerated for unrelated purposes is not necessarily subjected to a *"custodial* interrogation" solely because he or she was questioned while so detained. *See People v. Denison*, 918 P.2d 1114 (Colo.1996). In determining whether an inmate has been restricted to the extent that she is "in custody" for *Miranda* purposes, a trial court must apply the four factors set forth in *Denison.* The four *Denison* factors are: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which he is confronted with evidence of his guilt; and (4)

the additional pressure exerted to detain him. *See id.* at 1116. *Denison* is applied as a " 'restriction' standard" in the detention or prison setting "[i]nstead of the traditional 'free to leave' standard for custody." *Id.* Thus, the four factors are applied solely to determine whether the detainee has had a change in surroundings "that results in an added imposition on [her] freedom of movement." [5] *Id.*

■■■ The inquiry, then, may not necessarily end with the factors as set forth in *Denison.* Other circumstances that a court may consider in determining whether an individual has been further restricted include, but are not limited to, the following:

> [T]he time, place and purpose of the encounter; the persons present during the interrogation; the words spoken by the officer to the defendant; the officer's tone of voice and general demeanor; the length and mood of the interrogation; whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; the officer's response to any questions asked by the defendant; whether directions were given to the defendant during the interrogation; and the defendant's verbal or nonverbal response to such directions.

*J.C.*, 844 P.2d at 1189; *see also Dracon*, 884 P.2d at 717. In the criminal or delinquency context involving a juvenile, a trial court may also consider, as one circumstance among the totality of circumstances, whether the juvenile's parents were present or had knowledge of the interrogation. *See J.C.*, 844 P.2d at 1189.

■■■ Where a trial court utilizes the correct legal standard, and its conclusion is supported by evidence in the record, we will not reverse its ruling on appeal. *See People v. Horn*, 790 P.2d 816, 818 (Colo.1990); *see also People v. Trujillo*, 784 P.2d 788, 792 (Colo.1990) (stating that our role on appeal is to "determine whether ... the court applied the correct legal standard to those findings

---

**5.** The *Denison* factors are used to determine only whether or not there has been an undue "limitation of movement or other form of restraint ...

placed on the defendant during the interrogation." *J.C.*, 844 P.2d at 1189.

in resolving the issue before it"). However, when a trial court fails to fully apply the correct standard, here the totality of the circumstances standard, its ruling cannot stand. *See People v. Quezada*, 731 P.2d 730, 732–33 (Colo.1987) (stating that a court's application of an erroneous legal standard to the facts of the case is subject to correction by a reviewing court). Where the findings are sufficient and supported by the record, an appellate court can review the matter and decide the issue as a matter of law. *See People v. Romero*, 953 P.2d 550, 555 (Colo. 1998) ("Trial court's legal conclusion is subject to our de novo review.").

### III.

■ In light of the foregoing, the result in this case turns on whether J.D., then located in the Nevada juvenile detention center, was "in custody" while interrogated, compelling that *Miranda* warnings be given and that the protections of section 19–2–511(1) attach.[6]

### A.

We begin by resort to our recent holding in *People in the Interest of J.C.* There, we held that a telephone call alone does not constitute a "custodial interrogation." *See J.C.*, 844 P.2d at 1190.

In *J.C.*, a police officer placed an investigatory telephone call to a juvenile suspect regarding a robbery. The telephone call took place outside the presence of a parent, guardian, or other responsible adult. Examining the totality of the circumstances, we held in that case that a telephone call inquiry does not constitute "custodial interrogation." *See id.* at 1190; *see also People v. Corley*, 698 P.2d 1336, 1339 (Colo.1985) (determining that "[n]otwithstanding that the investigation may have focused on the defendant, the questioning of her by a policeman over the telephone" was not custodial for purposes of *Miranda* ). We based our holding in *J.C.* on the principle that "when the interrogating officer is not in the physical presence of the accused, that officer cannot exercise immediate control over the actions of the accused such as to trigger *Miranda* concerns." *J.C.*, 844 P.2d at 1190. We also stated that "[i]t is not reasonable, even for a [juvenile], to believe that a police officer will be able to directly control one's actions over the telephone." *Id.*

■ Here, neither the transcript of the telephone conversation, nor Kuretich's testimony indicate coercion or control by the Fort Morgan police. Nor do we see any indication of control exercised by the two adults present with J.D.—Hagen, her probation officer, and Foster, a detention officer at the Nevada facility. J.D. was in control from the outset, initiating telephone contact with Kuretich on October 29, accepting the return telephone call from Kuretich, and obtaining his agreement to dismiss certain pending charges and not to prosecute her as an adult for the robbery offense in exchange for her cooperation.

We conclude that the telephone call with Detectives Kuretich and Gardner alone did not constitute a *"custodial* interrogation." Next we must determine whether the interrogation of J.D. while detained in the Nevada juvenile facility necessarily constituted a "custodial interrogation" so as to require *Miranda* warnings.

### B.

The United States Supreme Court has held that, notwithstanding a "coercive environment," there is no custody for *Miranda* purposes unless the questioning takes place "in a context where [the questioned person's] freedom to depart [is] restricted." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977). In other articulations of the custody standard, the inquiry has focused on any limitation of movement or "whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517,

---

**6.** We find nothing in *Miranda* to suggest that a detainee is automatically "in custody" and therefore entitled to *Miranda* warnings merely by virtue of her status as a detainee in a juvenile facility. *See Denison,* 918 P.2d at 1116; *see also United States v. Scalf,* 725 F.2d 1272, 1275–76 (10th Cir.1984) (approving of the view that an inmate is not ipso facto "in custody").

77 L.Ed.2d 1275 (1983) (internal quotation marks omitted).

However, in cases involving persons in the custody of the state for other purposes, i.e., persons detained for some unrelated offense, "custodial interrogation" determinations are not resolved by the mere fact that the citizen was imprisoned or otherwise physically detained at the time the questioned statements were given. *See Denison,* 918 P.2d at 1116. Such "in custody" determinations do not lend themselves to easy analysis under the traditional formulations of the *Miranda* rule or through standard totality of the circumstances analogies. Certainly, a person in custody for unrelated matters, such as a detainee incarcerated by the state or, as here, by some other jurisdiction, will always perceive that her freedom of movement is restrained. Hence, a detainee will certainly sense that she is not otherwise at liberty to leave or depart from the general area that also serves as the location of an interview conducted by an officer in a detention facility. *See United States v. Conley,* 779 F.2d 970, 973 (4th Cir.1985). Even without the police intrusion subject to review here, J.D., a detainee in the Nevada facility, was not free to leave.

A preexisting limitation upon a person's freedom of movement, therefore, should not control the analysis under our totality of the circumstances standard. To allow this single factor to be outcome determinative would result in a per se rule that a person who is incarcerated or otherwise detained is "in custody," for all purposes.

Under that reasoning, our entire jail and prison population would be entitled to a per se finding of custody for purposes of *Miranda. See Denison,* 918 P.2d at 1116 (citing *Cervantes v. Walker,* 589 F.2d 424, 428 (9th Cir.1978)). We clearly rejected that result in *Denison,* a result that neither our totality of the circumstances standard nor reason will ordain. We have wisely rejected such a bright-line approach in the past and today reaffirm our fidelity to the totality of the circumstances standard, even when an interrogation involves a person detained in a government facility for purposes unrelated to the matter under investigation.

In this case, the trial court considered the evidence submitted at the suppression hearing, the statements of counsel, and the transcript of the telephone call in determining the facts surrounding the interrogation. In its oral ruling from the bench, the trial court concluded that a reasonable person in J.D.'s position would have considered herself deprived of her freedom of action during the police questioning.

The trial court found that it was necessary to exclude J.D.'s statements based on "the physical surroundings of the interrogation, the extent to which the juvenile is confronted with evidence of guilt during the conversation, and any additional pressures that might have been exerted to detain that person." While we do not question the trial court's decision to apply the totality of the circumstances standard, we disagree with the legal conclusion it reached, finding that J.D. was "in custody."

In *Denison,* we set forth four factors or elements that must be considered when determining whether a person who is interrogated while incarcerated is "in custody," subjecting one to a "custodial interrogation." Those four factors include: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which the individual was confronted with evidence of his guilt; and (4) any additional pressure exerted to detain him. *See Denison,* 918 P.2d at 1116.

Applying the four elements of the *Denison* test, in particular, whether any additional pressure was *exerted to detain* J.D., and based on the trial court's factual findings, none of which are in material dispute, we conclude otherwise. Unlike the trial court, we do not view the offer of reduced charges, an inducement to cooperate to be sure, as "pressure exerted to *detain*" J.D. Pressure to detain is different from pressure to speak. While pressure to speak may be considered in determining the voluntariness of the statements, only custody is at issue here, not voluntariness.

Applying the totality of the circumstances standard here, we conclude that J.D. was not "in custody" within the meaning of *Miranda;*

therefore, we hold that J.D. was not subjected to a "custodial interrogation" when she voluntarily confessed to her participation in the subject robbery. Since she was not "in custody" while interrogated, *Miranda* warnings were not required. Likewise, without "custody," our juvenile statute, section 19–2–511(1), does not apply.

Our application of the totality of the circumstances standard in this case considers whether J.D. was deprived of her freedom of movement within the detention facility through additional restrictions. We apply the *Denison* test to determine whether J.D. was "in custody" during the interrogation. To better understand our application of the *Denison* test, we briefly revisit *Denison*.

In *Denison*, the trial court suppressed the suspect's statements after an assault that occurred in the jail where the suspect was awaiting trial. There the sheriff confronted the suspect in his cell and asked questions to discover who was hurt. *See Denison*, 918 P.2d at 1115. We reversed the trial court's ruling. In *Denison*, we held that an inmate is not automatically "in custody" and therefore entitled to *Miranda* warnings merely by virtue of his prisoner status. *See id.* at 1116; *cf. People v. Lee*, 630 P.2d 583, 588 (Colo. 1981) (custodial interrogation found where the suspect was in police custody for a separate offense and officers subjected the suspect to three face-to-face interrogations without *Miranda* warnings). We further held that under the circumstances in that case, the interrogation of the defendant was not custodial. *See Denison*, 918 P.2d at 1116. In a prison situation, restriction "implies a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Id.* Integrating *Denison* into our totality of the circumstances standard here, J.D.'s surroundings—her detention in the Nevada facility at the time of the questioning—alone, will not support the

trial court's ruling. Under *Denison*, a trial court should consider four factors when deciding whether the interrogation of an incarcerated person is "custodial" because she "has been restricted so as to require the advisement of *Miranda* rights." *Id.* Again, the four factors we consider are: (1) the language used to summon J.D.; (2) the physical surroundings of the interrogation; (3) the extent to which J.D. was confronted with evidence of her guilt; and (4) any additional pressure exerted to detain her. *See id.*

In the present case, although J.D. was detained in the Nevada facility, application of our totality of the circumstances standard, as set forth in *Denison*, will not support the trial court's legal conclusion that J.D. was "in custody" for purposes of *Miranda*. First, J.D. was not summoned, but in fact, initiated the telephone contact that led to the incriminating statements. J.D. spoke with Kuretich voluntarily after being informed that she should have someone she trusted present with her during the conversation. In addition, prior to the telephone conversation, Kuretich contacted J.D.'s mother, gave her a written *Miranda* warning, and only returned J.D.'s call after he was aware that J.D.'s mother knew that J.D. intended to speak with the officers and that she did not object to such a telephone interrogation.

Second, the interrogation occurred over the telephone while J.D. was in Nevada and without any adverse change in J.D.'s physical surroundings during the interrogation.[7] J.D. was not subjected to a face-to-face questioning by which Kuretich could exercise control over her and there were other adults present during the interrogation whom J.D. trusted, i.e., her probation and detention officers, who were present only at J.D.'s request.

As to the third *Denison* factor, we agree that it militates against the State's argument. Clearly, Kuretich confronted J.D. with evi-

---

7. Based on the transcript, it appears that J.D. arranged to receive the telephone call in a private room accompanied by Hagen and Foster. This is certainly consistent with the fact that J.D.'s greatest concern was not whether she would cooperate but who would know that she cooperated. Her fear was so great that she stressed the importance of confidentiality and asked Kuretich to assure her that he would not inform any of the others involved of her cooperation. She stated adamantly, "I'm not gonna get shot."

dence of her guilt, including photographs of J.D. taken during the robbery.

The final *Denison* factor, however, requires a different result. While the record indicates that at the outset of the interrogation J.D. was "pressured" to cooperate by Kuretich's offer to drop the unrelated charges and not charge her as an adult for her part in the robbery, there is no evidence whatsoever of any "additional pressure exerted *to detain her.*" She was not told at that time that she was under arrest for the robbery and she was not handcuffed. Her physical surroundings were not altered during the course of the interrogation, she was not segregated from the general population at the facility nor was she threatened with such a segregation.[8] Nor does our examination of the record reflect any other restraint or limitation on J.D.'s freedom. There was simply no "restriction" placed on J.D. that resulted in an added imposition on her freedom of movement nor pressure "exerted to detain her." Under the circumstances, the presence of Hagen and Foster did not exert a pressure to detain sufficient to have caused a reasonable person to believe her freedom of movement had been further diminished.

In sum, we find very little to support a determination that J.D. was "in custody." In fact, the uncontroverted facts militate against such a conclusion. J.D. initiated the contact with Kuretich, indicating her desire to discuss the robbery. There is no evidence to indicate that J.D. was unable to terminate the telephone conversation at any time. Moreover, a review of the record reveals that J.D. spoke freely and her statements consumed a substantial portion of the conversation. The extent to which she responded to the questions is consistent with her expressed desire to discuss the robbery. Based on the totality of the circumstances, including J.D.'s detention in the Nevada juvenile facility, we are unable to uphold the trial court's conclusion that J.D. was "in custody" and subjected to a custodial interrogation.

## IV.

Having so held, we now turn to the question of whether parental presence was required as set forth in section 19–2–511(1). By its plain language, section 19–2–511(1) only excludes statements or admissions "made as a result of a custodial interrogation," without the presence of a parent, guardian, or legal or physical custodian. It does not apply to non-custodial situations. *See J.C.*, 844 P.2d at 1188. Because we reverse the trial court's ruling that J.D. was "in custody," we likewise reverse its ruling that her parents were required to be present. Therefore, we hold that a juvenile's non-custodial statements may not be suppressed merely because they are made outside the presence of a parent. *See id.*

## V.

In conclusion, we hold that Kuretich's telephone questioning of J.D., while certainly a form of interrogation, did not constitute a "*custodial* interrogation" on this record. We also hold that because J.D.'s telephone statements were not made while she was subject to a "custodial interrogation," Detective Kuretich was not required to give J.D. an advisement of her *Miranda* rights. Similarly, we hold that section 19–2–511(1), 6 C.R.S. (1999), applies only to "custodial interrogations."

Accordingly, we reverse the order of the trial court suppressing the statements made to the detectives and return this case to the trial court for further proceedings not inconsistent with this opinion.

Justice MARTINEZ dissents, and Justice HOBBS and Justice BENDER join in the dissent.

Justice MARTINEZ dissenting:

The majority reverses the trial court for deciding that the juvenile, who was in detention for another matter, was in custody for purposes of *Miranda*. The majority faults the trial court for finding that promises, threats, and confrontation with evidence of

---

**8.** As we previously noted, the fact that the interrogation occurred while J.D. and the two adults she trusted were in a separate room is consistent with J.D.'s paramount interest and concern that others not know that she was cooperating.

guilt contribute to a determination that there was additional pressure exerted to detain the juvenile. *See* maj. op. at 770, 772. The majority holds that "the voluntary telephone statement of a juvenile" should not be suppressed. *Id.* at 765. I believe that the trial court understood that a juvenile questioned by telephone while in detention for another matter is generally not in custody for purposes of *Miranda.* Because the trial court considered the appropriate factors in arriving at the conclusion that the speakerphone interrogation of *this* juvenile was custodial, I would affirm. Accordingly, I respectfully dissent.

## I.

Among the factors that were significant to the trial court were the physical surroundings of the juvenile during the interrogation, the extent to which she was confronted with evidence of her guilt, and the additional pressures exerted to detain her while she was persuaded to confess. That is, the interrogating detective promised her that he would file no charges, or minimal charges, against her for the robbery and that he would not file unrelated charges. He told her that other suspects had given statements and that he might offer them the same deal to implicate her. He threatened her with being returned to Colorado and sent to prison as an adult. Her probation officer, who participated from the juvenile's end of the speakerphone conversation, assisted the detective by explaining the threats and promises, and by initiating the threat that she would be charged as an adult. Accordingly, I begin by relating some of the record support for the trial court's findings and conclusions of law. Subsequently, I will explain how the trial court considered these facts, applied the totality of circumstances test and the *Denison* qualification of that test, and concluded that this particular juvenile was in *Miranda* custody.

## A.

Fort Morgan police officers detained J.D., a juvenile, on October 28, 1998, for an unre-

lated incident at a motel and as a runaway from Nevada. While J.D. was in detention, Detective Kuretich confronted her in person and asked if she knew anything about a robbery in Colorado.[1] After J.D. denied any involvement in the robbery, Kuretich confronted her with photographs from the robbery pointing out that one of the females in the photographs looked similar to her. He made clear that if his investigation concluded that she was a suspect, he would arrest and charge her accordingly. He also told her that she would remain under suspicion regardless of her transfer to Nevada. J.D. steadfastly refused to talk, so Kuretich gave her his name and telephone number, in case she changed her mind.

From the detention center in Nevada, J.D. called Kuretich's office and left a message for him to return her call. Kuretich later returned her call. Kuretich testified at the suppression hearing that during this initial phone contact, she was in "a large room" where "several girls of her own age were present." Kuretich told her to arrange to have "someone she trusted" with her for the interview.

Kuretich then called the facility again on the same day. Arrangements had been made for June Foster, a detention officer, and Steve Hagen, J.D.'s probation officer, to be present during an interview through a speakerphone. The call took place in a different room, separate from the general population at the detention center.

After Foster answered the call, Kuretich spoke with Hagen. The probation officer identified himself, told Kuretich that he was on the speakerphone and that J.D. was present. Kuretich said hello to J.D. and then explained to Hagen everything he and J.D. discussed during their encounters up to that point. Kuretich explained that he told J.D. that she had some charges pending when he tried to question her during her detention in Colorado. He told Hagen that he "informed [J.D.] that she was possibly a suspect as an accomplice to a robbery."

---

1. The parties did not raise any issues regarding this initial contact in detention. Thus, I do not consider any impact of this contact here, other than as factual background.

He also explained to Hagen that he had already told J.D. that if she cooperated, "I would do what I can to dismiss the charges which occurred at the motel as well as possibly work a deal out with the District Attorney's office in reference to her involvement in the robbery." Finally, he discussed a subsequent conversation with the deputy district attorney. He claimed that the D.A. felt that they could work something out "based on what information that [J.D.] was to give us."

After this background introduction with Hagen, Kuretich again addressed J.D. At the outset, J.D. was concerned about whether any of the other suspects would find out that she spoke with Kuretich. Kuretich assured her that he would not use the telephone recording when dealing with the other suspects. The attempt to persuade her to give a statement continued, with assistance from the probation officer, as follows:

Kuretich: Okay. Well J.D., what do you want to do? Do you want to give me a statement on how you were involved so we can try to work something out?

J.D.: I don't want them to know, I was telling you this.

Kuretich: Okay well they're not here and you're in Nevada and I'm definitely going to question them further. I haven't told them that I've talked to you already. They don't know that you talked to me a couple days ago.

J.D.: So you're not going to say anything about me? (inaudible)

Kuretich: Well I don't plan to.

J.D.: Okay it's not going to show up in court that I said anything (inaudible) there.

Kuretich: That, I can't promise you that. I mean all I'm trying to do is work a deal out with you. So you don't have to go to prison for a robbery charge.

Hagen: Very serious, you could (inaudible).

J.D.: I know, but I'm not gonna get shot.

\* \* \*

Hagen: (inaudible) in the state of Colorado she can be certified as an adult.

Kuretich: That's correct. And that's what the district attorney mentioned this morning, is that part of the deal that we've worked out is if any charges were filed, we wouldn't charge her as an adult, but probably as a juvenile, which would make a big difference on how much time you serve in jail, if any at all.

Hagen: What it sounds like to me here, is with your cooperation they won't go after you with full charges. If you don't cooperate with them they might go after you with all the charges.

Later, Kuretich suggested that J.D. may not have to return to Colorado if she confessed, and that. if she did not confess the others involved would be offered the same deal and would likely take it:

Kuretich: And I, part of helping you out is to try to keep you from . . . having to testify . . . And if I end up not charging you then you're not gonna have to come back here.

J.D.: And what if you come (inaudible) talk to them [other suspects].

Kuretich: There are several people who have talked already. You're not just the only one.

\* \* \*

Kuretich: Let me put it this way [J.D.], when I bring them in here and I'm gonna, I may offer them the same kind of deal. Let me know about the robbery and who was involved and in turn I'm gonna give you this kind of deal. Which means that they may be not going to jail but they may finger you, and then, you're gonna have to go to jail.

J.D.: (inaudible) from me because I wasn't ever inside the store.

Kuretich: Now as I explained to you, you don't have to be inside the store to be charged as an accomplice.

J.D.: I know that.

Kuretich: I am aware that you were a look out. You went and looked through the window as the whole thing occurred.

Afterward, J.D. went on to disclose her involvement in the robbery and the role of the other suspects. Kuretich ended the telephone call, as he began it, with a conversa-

tion with Hagen. Based on her statements, J.D. was charged with one count of aggravated robbery with a sentencing enhancement for violent crimes. *See* §§ 18–4–302(1)(b), 6 C.R.S. (1999); 19–2–516(3), (4), 6 C.R.S. (1999).

## B.

The sole issue before us is whether J.D. was in custody for *Miranda* purposes. The voluntariness of the statements made by J.D. was not resolved in the trial court and is not before us. I agree with the majority that the correct test to determine whether a juvenile is in custody for *Miranda* purposes is a totality of the circumstances test. *See* maj. op. at 768. I also agree that, in detention settings, the appropriate test is a totality of the circumstances test that takes into account the factors set forth in our recent decision in *Denison*. *See* maj. op. at 768.

When determining whether a person is in custody for *Miranda* purposes, a court must decide "whether a reasonable person in the suspect's position would consider herself deprived of her freedom of action in a significant way at the time of questioning." *People v. Dracon*, 884 P.2d 712, 716–17 (Colo.1994); *see also People v. Trujillo*, 784 P.2d 788, 791 (Colo.1990). Courts rely on the totality of the circumstances test to determine a reasonable person's belief. *See Dracon*, 884 P.2d at 717; *Trujillo*, 784 P.2d at 791.

When a person is in detention for another matter, a "restriction" standard is used for custody determinations. *See People v. Denison*, 918 P.2d 1114, 1116 (Colo.1996)(citing *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978)). Under the "restriction" standard, a court includes four factors within the totality of the circumstances test when deciding whether a detained person is in *Miranda* custody. *See Denison*, 918 P.2d at 1116. The four factors are: "(1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which [the detainee] is confronted with evidence of his guilt; and (4) the addi-

tional pressures exerted to detain [the detainee]." *Id.*

The *Denison* restriction standard is consistent with the purpose of *Miranda*. *Miranda* was primarily concerned with the inherently coercive nature of custody. *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When a person is already detained for another reason, the detention is no longer inherently coercive. If we were to judge all detention settings as inherently coercive, then the on-the-scene questioning exception outlined in *Miranda* would disappear in such settings. *See Cervantes*, 589 F.2d at 427 (citing to *Miranda*, 384 U.S. at 477, 86 S.Ct. 1602). Every investigative or fact-finding interview in a detention setting would require *Miranda* warnings. *Id.* This result would be inconsistent with *Miranda*. Hence, the *Denison* factors are designed to test whether the coercive aspect of the detention is present even though the person was already in detention.

This concern about the coercive nature of detention is missing from the majority's understanding that the *Denison* factors *only relate to* "an undue 'limitation of movement or other form of restraint ... placed on the defendant during the interrogation.'" Maj. op. at 768–769 fn. 5 (quoting *People in the Interest of J.C.*, 844 P.2d 1185, 1189 (1993)).[2] The *Miranda* Court appraised psychological restraints as a more important factor than physical restraints for determinations of coerciveness. *See Miranda*, 384 U.S. at 448, 86 S.Ct. 1602. Consistent with this appraisal of psychological restraints, some of the *Denison* factors do not address physical restraints. The language used to summon an individual and whether the person is confronted with evidence of guilt focus instead on psychological restraint.

Correctly applying the test, the trial court made thorough findings concerning all the circumstances of the interrogation, including the *Denison* factors. Regarding the first *Denison* factor, the trial court found nothing significant in the way the officers summoned

**2.** The majority cites *J.C.* to characterize the *Denison* factors as only relating to physical restraint, even though *J.C.* was decided three years before *Denison*. *See* maj. op. at 768–769 fn. 5. *J.C.* is not relevant to a discussion of the *Denison* factors because J.C. was at home during the interrogation, not in detention. *See J.C.*, 844 P.2d at 1186.

the juvenile. Under the second factor, however, the trial court made findings regarding J.D.'s physical surroundings during the interrogation. The trial court found that J.D. was in a room separate from the population at the detention center. The trial court further found that J.D.'s probation officer and a detention officer were present for the duration of the interrogation.

Kuretich's testimony supports the finding that the interrogation took place in a room separated from the rest of the population in detention. Kuretich testified that the first call took place in a large room with many girls of J.D.'s age present. During the speakerphone interrogation, Hagen said that only he, Foster and J.D. were present. The probation and detention officers were present in the room for the duration of the interrogation as noted from the telephone transcripts. Throughout the conversation, the probation officer actively participated: the speakerphone interrogation began and ended with him and he helped the detective persuade J.D. to talk.

Under the third factor, the evidence in the record supports the trial court's finding that Kuretich confronted J.D. with evidence of her guilt. At the suppression hearing, Kuretich testified that he showed J.D. pictures of the robbery. In these pictures, there was a female that looked like J.D. During the speakerphone interrogation, Kuretich said that he had several other people to interrogate who "may finger [J.D.]." He also claimed that he was aware that "[J.D.] was a look out [who] went and looked through the window as the whole thing occurred."

There is ample evidence to support the trial court's finding of additional pressures used to detain J.D. under the fourth factor. Even before the recorded telephone interrogation, Kuretich had mentioned his efforts to reduce the charges against J.D. in exchange for her information on the robbery. He threatened that she would be returned to Colorado, prosecuted as an adult, and sent to prison.

Before J.D. made incriminating statements, Hagen and Kuretich exerted pressure on J.D. to keep her detained in a separate room and coerce her into confessing. These promises and threats increased when she appeared reluctant to give a statement. The record also supports the trial court's finding that, "there was both coaxing and some implied threats that if she was not willing to cooperate that they would seek information from others and then would proceed with full panoply of charges against her." In the trial court's judgment, all these actions exerted pressure to keep her detained in a separate room for the duration of the interrogation.

The trial court made other findings regarding the circumstances of the interrogation. The trial court found that J.D. did not have control over the telephone and could not hang up at any time to end the interrogation. The evidence in support of this finding includes the presence of the two officers during the entire interrogation and the fact that it was a telephone conference by speakerphone. The trial court also noted that this case was distinguishable from other cases where the defendant had the power to end the conversation by simply hanging up.

In contrast to this finding supported by the record, the majority found that J.D. had control over the speakerphone interview. *See* maj. op. at 769. The majority did not see "any indication of control exercised by [the] two adults present with J.D." *Id.* The majority argued that "[t]here is no evidence to indicate that J.D. was unable to terminate her telephone conversation at any time." *Id.* at 772.

Also in contrast to the trial court's supported findings, the majority found that there was no restriction or limitation on J.D.'s freedom during the interrogation. *See id.* at 772. In the majority's opinion, there was "no 'restriction' placed on J.D. that resulted in an added imposition on her freedom of movement." *Id.*

The majority found that the probation and detention officers attended the telephone interrogation at J.D.'s request and were people that J.D. trusted. *See id.* at 771. Nowhere does the record even suggest that J.D. trusted Hagen or Foster, only that Kuretich instructed her to get someone she trusted. Nevertheless, the majority assumes that J.D. was able carry out these instructions, make

the arrangements for a private room with a speakerphone, and find people she trusted while in detention.

The record supports the trial court's opposite conclusion. J.D.'s language betrayed her uneasiness with the whole interrogation. In fact, Kuretich had to point out that she "need[ed] to start trusting someone." Based on the circumstances of the interrogation, the trial court found that, in the company of Hagen and Foster, J.D. was under restraint. The trial court also found that there was not a parental or custodial figure present. Hence, the majority's finding that she trusted Hagen and Foster is inconsistent with the record and the trial court's findings concerning the role the officers played in restraining her movement and preventing her control over the speakerphone.

While the majority "do[es] not question the trial court's decision to apply the totality of the circumstances standard" or its "factual findings, none of which are in material dispute," maj. op. at 770, they nonetheless apply the same standard to those findings and reach a different conclusion. *See id.* I agree with the majority that the evidence supported the trial court's findings and that the trial court applied the proper test in determining that the juvenile was in custody. I further agree that the standard of review is a clearly erroneous standard, under which we will not reverse "[w]here the trial court utilizes the correct legal standard, and its conclusion is supported by evidence in the record." *Id.* at 768.

This totality of the circumstances test by nature lends itself to the deferential standard laid out above. No single factor is required or exclusive of the others. As such, reasonable people can disagree about the factors applicable to the circumstances of a certain case. Different circumstances require different factors. The trial court must apply the test to decide which factors are present and what weight each factor deserves. The trial court carries out this application and decision-making on a case by case basis, warranting deference on the part of the appellate court.

It is generally true that the degree of restraint and control associated with a custo-dial setting does not occur by telephone, or when the detention is for an unrelated matter. However, the trial court found particulars which make this case exceptional: the use of a speakerphone, the presence of officers assisting the interrogation, the separation from the general population, and the promises and threats about whether the detained juvenile would be returned to Colorado for prosecution.

Consequently, I believe that the applicable standard of review requires us to uphold the trial court's suppression ruling even if we would rule differently were we sitting as the trial court.

### II.

The trial court considered the totality of the circumstances in this case, including the four factors applied in detention settings. Under these factors, the trial court made explicit findings. I find evidence in the record to support these findings. I would not substitute the trial court's findings or conclusion with my own. Hence, I would uphold the trial court's ruling to suppress the statements made during the interrogation.

Justice HOBBS and Justice BENDER join in this dissent.

