1
 2025 CO 7 Patrick Frazee, Petitioner: v. The People of the State of Colorado. No. 23SC85
Supreme Court of Colorado, En Banc
February 10, 2025

 The
 supreme court granted certiorari to determine whether a
 Department of Human Services caseworker is a law enforcement
 officer under Miranda v. Arizona, 384 U.S. 436
(1966), and, if so, whether Miranda's test for
 custody applies when someone in pretrial detention is
 questioned about the facts underlying their custody.

 Following
 the principles set forth in Densmore v. People, 2025
 CO 6, ¶¶ 2, 28, 46,P.3d, also announced today, the
 court concludes that the Department of Human Services
 caseworker here was neither a law enforcement officer nor an
 agent of law enforcement for Miranda purposes.
Accordingly, Miranda does not apply in this case,
 and, thus, the court need not reach the question of whether
 Miranda's test for custody should apply when a
 Department of Human Services caseworker questions someone in
 pretrial detention about the facts underlying their custody.

 Certiorari to the Colorado Court of Appeals Court of Appeals
Case No. 20CA35

 Attorneys for Petitioner: Megan A. Ring, Public Defender Sean
 James Lacefield, Deputy Public Defender Denver, Colorado.

 Attorneys for Respondent: Philip J. Weiser, Attorney General
Brittany Limes Zehner, Assistant Solicitor General Denver,
 Colorado.

 Attorneys for Amici Curiae ACLU of Colorado and Office of
 Respondent Parents' Counsel: Timothy R. Macdonald Sara
 Neel Emma Mclean-Riggs Laura Moraff Denver, Colorado Zaven T.
 Saroyan Denver, Colorado.

 Attorneys for Amicus Curiae Colorado Department of Human
 Services: Philip J. Weiser, Attorney General Nicole Chaney,
 Assistant Attorney General Denver, Colorado.

 Attorneys for Amici Curiae Denver Department of Human
 Services and Arapahoe County Department of Human Services:
 Amy J. Packer, Assistant City Attorney Denver, Colorado
 Jordan Lewis, Assistant County Attorney Aurora, Colorado.

 Attorneys for Amici Curiae Office of Alternate Defense
 Counsel and Colorado Criminal Defense Bar: Spencer Fane LLP
Dean Neuwirth Denver, Colorado.

 JUSTICE GABRIEL delivered the Opinion of the Court, in which
 CHIEF JUSTICE MARQUEZ, JUSTICE BOATRIGHT, JUSTICE HOOD,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.

 OPINION

 GABRIEL JUSTICE.

 ¶1
We granted certiorari to determine whether a Department of
 Human Services caseworker is a law enforcement officer under
 Miranda v. Arizona, 384 U.S. 436 (1966), and, if so,
 whether Miranda's test for custody applies when
 someone in pretrial detention is questioned about the facts
 underlying their custody. Patrick Frazee urges us to adopt a
 bright-line rule that Department of Human Services
 caseworkers must give Miranda warnings any time they
 interrogate someone in custody about current or unsolved
 allegations that a reasonable caseworker should know are
 criminal. In the alternative, Frazee argues that, under the
 totality of the circumstances, the caseworker here was acting
 as a law enforcement officer or as an agent of law
 enforcement and, thus, was required to give Miranda
 warnings.

 ¶2
 In Densmore v. People, 2025 CO 6, ¶¶ 2,
 38, 46, P.3d, which we are also announcing today, we
 addressed a nearly identical issue and concluded that, under
 a totality of the circumstances test, the caseworker there
 was not acting as an agent of law enforcement for purposes of
 Miranda and, thus, Miranda did not apply.
Guided by the principles announced in Densmore, we
 conclude that Department of Human Services caseworker Mary
 Longmire likewise was neither a law enforcement officer nor
 an agent of law enforcement for Miranda purposes.
Accordingly, Miranda does not apply in this case,
 and we need not reach the

 question of whether Miranda's test for custody
 should apply when a Department of Human Services caseworker
 questions someone in pretrial detention about the facts
 underlying their custody.

 ¶3
We therefore affirm the judgment of the division below,
 albeit on different grounds.

 I.
Facts and Procedural History

 ¶4
 Frazee was arrested in connection with the November 22, 2018
 murder of his romantic partner, Kelsey Berreth.

 ¶5
 Frazee and Berreth had a daughter who was just over one year
 old at the time of Berreth's death. On the day of
 Frazee's arrest, December 21, 2018, the Teller County
 Department of Human Services (the "Department")
 received a referral from the Woodland Park Police Department
 concerning the child. This referral was assigned to Longmire,
 the child and family services administrator with the
 Department, and, in this instance, Longmire agreed to serve
 as a caseworker. The child was brought to the
 Department's office, and a court granted the Department
 emergency custody of her.

 ¶6
 That same day, Longmire went to the Teller County jail to
 meet with Frazee. The purpose of this meeting was to serve
 Frazee notice of the upcoming shelter care hearing concerning
 the child, to provide him with information about the

 dependency and neglect process, and to inform him that the
 child was in the Department's custody.

 ¶7
 Several days later, on December 26, Longmire again met with
 Frazee at the Teller County jail. It is this meeting that is
 at issue in this case. No law enforcement authorities asked
 Longmire to conduct this meeting, and she did not notify the
 local police that she was doing so. The meeting took place
 the day before a preliminary protective proceeding concerning
 the child was scheduled to occur. As of this time, Frazee had
 not yet been formally charged with Berreth's murder. Law
 enforcement officers had, however, told Longmire what they
 believed had happened, although they did not provide details
 and Longmire did not have access to any search or arrest
 warrants that had been issued in the case.

 ¶8
 Longmire met with Frazee in the jail's video advisement
 room, which is used for, among other things, video
 advisements, video court sessions, attorney visits, and other
 official visits, such as the one at issue here. A deputy
 brought Frazee into the room, but the deputy did not stay,
 and Longmire was alone with Frazee during the meeting. Frazee
 was neither handcuffed nor restrained, nor did Longmire limit
 his freedom of movement during the meeting. And Frazee was
 free to leave at any time. Longmire, who was not a law
 enforcement officer and who had never been trained in law
 enforcement interrogation techniques, did not provide
 Miranda warnings to Frazee.

 ¶9
 At the outset of the meeting, Longmire explained to Frazee
 that due to his incarceration, the child did not have an
 appropriate caregiver and that Longmire had questions for
 Frazee regarding that issue. Longmire expressly told Frazee
 that she would understand if there were questions that he did
 not want to answer due to the allegations against him and the
 ongoing criminal investigation.

 ¶10
 Longmire further told Frazee that she was there to complete
 her assessment of the family and to gather information about
 the child that she needed in order to complete the paperwork
 for the Interstate Compact on the Placement of Children. In
 particular, she explained that she "needed to learn
 about [Frazee's] background growing up, about [the
 child's] development, if she had any medical issues, you
 know, what was her daily schedule, how was her development,
 different things like that." Longmire also asked about
 Berreth, Frazee's relationship with her, and the custody
 arrangement that they had regarding the child, so that
 Longmire could understand what the child's daily life was
 like, whom she was with and when, and her relationship with
 both of her parents. And Longmire went through a list of
 fourteen standardized questions that she and her colleagues
 use to compile a child's family history and to complete
 an assessment.

 ¶11
 In response to Longmire's questions, Frazee described how
 he and Berreth met, and he provided context and background on
 their relationship. He also

 provided background information on himself, his upbringing,
 his family, and his childhood, as well as some information on
 Berreth's relationship with his family. ¶12 In
 addition, although Berreth was, in fact, deceased by the time
 of this meeting, Frazee told Longmire where Berreth was
 living, and he noted that he was not living with her at that
 time. He then described the custody arrangement that he and
 Berreth had concerning the child, noting that it was a
 "split custody" arrangement, which was a
 then-recent change from their initial arrangement, in which
 Frazee had had the child during the day while Berreth worked.

 ¶13
 The conversation next turned to the Thanksgiving 2018 time
 frame, when Berreth went missing. Longmire explained that she
 wanted to discuss that period in order to determine where the
 child was, particularly during the time of Berreth's
 disappearance. This was relevant to the allegation that the
 child had been exposed to an injurious environment or to
 violence. Accordingly, Longmire wanted to know the timeline
 of events involving the child during those several days.

 ¶14
 Frazee explained that he had the child with him the day
 before Thanksgiving and that he was to return the child to
 Berreth that day. For several reasons, however, the exchange
 was delayed, and Frazee ultimately returned the child to
 Berreth late that evening. The child was to spend
 Thanksgiving morning with Berreth and Thanksgiving afternoon
 with Frazee, and in accordance with this plan, Frazee picked
 up the child on Thanksgiving and took her with him to do

 some work, which was not atypical. Thereafter, they went to
 Frazee's mother's house for Thanksgiving dinner, and
 they stayed there through the evening.

 ¶15
 Frazee then told Longmire that on the Friday after
 Thanksgiving, he had several communications with Berreth
 regarding the exchange of the child. According to Frazee,
 Berreth told him that she needed to sort some things out, and
 she asked him to keep the child that day, which he did.

 ¶16
 Frazee claimed that he had telephone calls or exchanged text
 messages with Berreth the next day (Saturday) and that
 Berreth again asked him to keep the child. Frazee told
 Longmire that during a conversation that day, Berreth
 "lost it," and, thus, Frazee wanted to keep the
 child "until the storm blew over."

 ¶17
 Frazee further told Longmire that he spoke with Berreth the
 following day (Sunday), and he and Berreth discussed where
 their relationship was going. Frazee indicated that they
 agreed that Frazee would continue to keep the child with him,
 and he again took her to work. Frazee then noted that he and
 Berreth exchanged several texts that day, after which he was
 unable to get a hold of her. Frazee's description of the
 timeline ended with Frazee indicating that he spoke with
 Berreth's mother on December 2 and that she said that she
 had not been able to reach Berreth. Frazee responded that
 Berreth needed her space.

 ¶18
 The meeting between Longmire and Frazee lasted between sixty
 and ninety minutes. Longmire described the meeting as
 professional, and she noted that

 Frazee was cooperative and provided a lot of information
 about the child. At no time during the meeting did Longmire
 confront Frazee about anything. In her view, she had no
 information with which to do so.

 ¶19
 After the meeting ended, Longmire documented what she had
 learned in a Referral/Assessment Summary. Pursuant to a
 release that Frazee had signed during one of Longmire's
 two meetings with him, Longmire shared her assessment
 documentation with both the district attorney's and
 public defender's offices.

 ¶20
 The criminal case against Frazee proceeded, and prior to
 trial, the People endorsed Longmire as a witness. Thereafter,
 Frazee moved to suppress all of the statements that he had
 made to Longmire at his December 26 meeting with her, arguing
 that the meeting was a custodial interrogation conducted
 without the requisite Miranda warnings. Frazee thus
 asserted that the admission of his statements to Longmire
 would violate his constitutional rights.

 ¶21
The trial court subsequently conducted an evidentiary hearing
 on Frazee's motion. At this hearing, Longmire testified
 to the conversations described above. ¶22 A few days
 later, the court issued a written order denying Frazee's
 motion. In support of its ruling, the court began by
 explaining that Miranda is inapplicable unless the
 suspect is in custody and the statement at issue was the
 product of a police interrogation. The court next observed
 that the facts that Frazee was

 incarcerated and that the meeting with Longmire took place at
 the county jail did not necessarily mean that Frazee was in
 custody. Rather, the court noted that in People v.
 Denison, 918 P.2d 1114, 1116 (Colo. 1996), People v.
 J.D., 989 P.2d 762, 768 (Colo. 1999), and People v.
 Parsons, 15 P.3d 799, 801-02 (Colo.App. 2000), this
 court and a division of the court of appeals described the
 factors that courts should consider in determining whether an
 inmate, who is already in custody, has been further
 restricted so as to establish custody for Miranda
 purposes. The court then opined that, by its terms,
 Miranda applies only to actions of law enforcement
 officials, and the court noted the statutory duties imposed
 on state human services departments to investigate and act in
 circumstances like those present here to ensure that the
 needs of the child are satisfied and to keep the court and
 the parents apprised as to the status of the matter.

 ¶23
 Applying these principles to the case before it, the court
 found that Longmire was not a police officer, a peace
 officer, or a law enforcement officer. To the contrary, her
 actions in this case were consistent with her duties under
 the Children's Code, and because a court had placed legal
 custody of the child with the Department, she was required by
 law to investigate the matter and to make a recommendation to
 the court regarding child placement. As a result, in the
 court's view, Longmire was not acting as an agent of law
 enforcement but, in fact, was acting independently of law
 enforcement. In addition, the court found that

 although Frazee was in jail, no custodial interrogation had
 taken place. Based on these findings, the court concluded
 that Longmire had no legal duty to provide Frazee with a
 Miranda advisement or warning.

 ¶24
The case proceeded to a jury trial at which Longmire
 testified regarding her meetings with Frazee. The jury
 ultimately found Frazee guilty of first degree murder after
 deliberation, felony murder, three counts of solicitation to
 commit first degree murder, and tampering with a deceased
 human body.

 ¶25
 Frazee then appealed, contending, among other things, that
 the trial court had erred in admitting Longmire's
 testimony. People v. Frazee, No. 20CA35,
 ¶¶ 1, 38 (Dec. 29, 2022). Specifically, he argued
 that suppression of his statements to Longmire was required
 because he had made those statements during a custodial
 interrogation that Longmire conducted without first providing
 him with Miranda warnings. Id. at ¶
 38.

 ¶26
 In a unanimous, unpublished decision, the division disagreed
 and affirmed the judgment of conviction. Id. at
 ¶¶ 1, 38-52, 115. In so ruling, the division agreed
 with the trial court that Frazee was not in custody for
 Miranda purposes during Longmire's meeting with
 him. Id. at ¶ 45. Accordingly, the division did
 not need to consider whether Longmire was acting as an agent
 of law enforcement during the meeting. Id.

 ¶27
 Frazee then petitioned this court for a writ of certiorari,
 and we granted his petition.

 II.
Analysis

 ¶28
We begin by setting forth the applicable standard of review
 and Miranda's requirements, particularly with
 regard to when a person other than a law enforcement officer
 conducts a custodial interrogation. We then apply those
 principles to the facts now before us.

 A.
Standard of Review and Applicable Legal Principles

 ¶29
 Our review of a trial court's order regarding a
 suppression motion involves a mixed question of fact and law.
Densmore, ¶ 27. We defer to the court's
 factual findings if they are supported by competent evidence
 in the record, but we review its legal conclusions de novo.
Id. Our review of a trial court's ruling on a
 suppression motion is limited to the record created at the
 hearing on that motion. Id.

 ¶30
 The Fifth Amendment to the United States Constitution
 protects individuals from compelled self-incrimination. U.S.
 Const. amend. V. To safeguard this right, Miranda,
 384 U.S. at 478-79, requires that when an individual is
 subjected to a custodial interrogation, the interrogator must
 advise the individual that (1) they have the right to remain
 silent; (2) anything they say can be used against them in a
 court of law; (3) they have the right to an attorney's
 presence; and (4) if they

 cannot afford an attorney, then one will be appointed for
 them prior to any questioning if they so desire. Absent an
 exception to this rule, unwarned statements made during a
 custodial interrogation are presumed to be compelled and are
 inadmissible in the prosecution's case in chief.
Verigan v. People, 2018 CO 53, ¶ 19, 420 P.3d
 247, 251.

 ¶31
 In Densmore, ¶ 29, which involved a nearly
 identical issue to that now before us, we explained that
 although Miranda typically applies to law
 enforcement officers conducting custodial interrogations, it
 also applies to non-law enforcement officers acting as agents
 of law enforcement. We further explained that to determine
 whether a non-law enforcement officer is acting as an agent
 of law enforcement in conducting a custodial interrogation,
 courts consider the totality of the circumstances, including
 both objective and subjective factors. Id. at
 ¶¶ 29, 33. And we provided a nonexclusive list of
 factors that courts may consider in determining whether a
 person, such as a Department of Human Services caseworker,
 was acting as an agent of law enforcement. Id. at
 ¶¶ 30-32. Such factors include the caseworker's
 duty to investigate and interview people who may be
 incarcerated; her authority to apprehend, handcuff, and
 detain others; her access to police reports and whether she
 reviewed any police reports before the interrogation at
 issue; her duty to report information that she learned; her
 job duties and the purposes of those duties; whether she was
 under contract with and

 paid by the state to perform these duties; whether she
 investigates crimes; whether her purpose was to obtain
 incriminating information; whether the police directed,
 controlled, or participated in her investigation or provided
 input regarding the questions she should ask the person to be
 interviewed; and the extent of the investigator's contact
 with law enforcement officers before she began her
 investigation. Id.

 ¶32
 Those same principles apply here, and with these principles
 in mind, we turn to the facts of this case.

 B.
Application

 ¶33
 Applying the above-described factors, we conclude that
 Longmire was not acting either as a law enforcement officer
 or as an agent of law enforcement when she spoke with Frazee.
Accordingly, she was not required to provide him with
 Miranda warnings before asking him questions.

 ¶34
 Specifically, evidence in the record of the suppression
 hearing established that Longmire was not a law enforcement
 officer, and she had no law enforcement training. Moreover,
 the police did not ask Longmire to meet with Frazee, and she
 did not advise them that she was doing so. And Longmire did
 not have access to any police reports or files, although
 before she met with Frazee, the police had shared with her
 their belief as to what had happened, albeit without
 providing details.

 ¶35
 When Longmire then met with Frazee, she did not have the
 authority to apprehend, detain, or handcuff him, and he was
 not restrained during his meeting with her. In addition,
 Frazee could have left at any time, and Longmire advised him
 at the outset of the meeting that he was free to decline to
 answer any of her questions, given the circumstances. And no
 law enforcement officers directed the meeting or scripted the
 questions that Longmire asked. Indeed, no law enforcement
 officers participated in or were even present for the
 meeting.

 ¶36
 Finally, as in Densmore, ¶ 36, Longmire's
 purpose for the interview was not to uncover violations of
 law, to develop evidence in a criminal case, or to enforce
 criminal law. Rather, her purpose was to learn about the
 child's needs, development, and relationships so that she
 could place the child in an appropriate home and ensure her
 safety. The fact that Longmire ultimately shared her
 assessment with the district attorney's and public
 defender's offices did not change this fundamental
 purpose of her meeting with Frazee. See id. Nor is
 it dispositive that Longmire was paid by the state. She had a
 statutory duty to investigate matters related to the child
 and to report certain information. In doing so, she was not
 performing a law enforcement function.

 ¶37
 Considering all of these factors in their totality, we
 conclude, as did the trial court with ample record support,
 that Longmire was not acting either as a law enforcement
 officer or as an agent of law enforcement when she met with
 Frazee.

Accordingly, she had no obligation to provide Frazee with
 Miranda warnings prior to speaking with him.

 ¶38
 In so concluding, and for the reasons set forth in
 Densmore, ¶ 32, we decline to adopt
 Frazee's proposed bright-line rule that Miranda
 should apply whenever a caseworker conducts a custodial
 interrogation that involves current or unsolved allegations
 that a reasonable caseworker should know are criminal. As we
 said in Densmore, such a rule would, as a practical
 matter, cover most child welfare interviews that caseworkers
 conduct of parents in custody, regardless of the
 circumstances of a particular case, and Frazee has offered no
 persuasive reason for extending Miranda to custodial
 interrogations conducted by people who are neither law
 enforcement officers nor agents of law enforcement. See
id.

 ¶39
We likewise are unpersuaded by Frazee's focus on the
 facts that the police made the initial referral; before
 Longmire met with Frazee, law enforcement officers had told
 her what they believed had occurred; and Longmire knew that
 Frazee was the subject of an active criminal investigation at
 the time she met with him.

 ¶40
 As to the referral, this is simply one way that a dependency
 and neglect proceeding begins. See §
 19-3-501(1), C.R.S. (2024) (authorizing law enforcement
 officers to refer dependency and neglect matters to the
 court, which may then designate a county department of human
 services to conduct an investigation).

 ¶41
 As to the facts that Longmire obtained some information
 before speaking with Frazee and was aware that an active
 criminal investigation was ongoing, we decline to conclude
 that a caseworker's attempt to educate herself about a
 case before she conducts her investigation, in and of itself,
 renders her an agent of law enforcement. Rather, as noted
 above, courts must consider the totality of the
 circumstances, and the fact that Longmire obtained
 information before meeting with Frazee, including that he was
 the subject of a criminal investigation, does not override
 the myriad factors described above establishing that Longmire
 was not acting either as a law enforcement officer or as an
 agent of law enforcement when she spoke with Frazee.

 ¶42
 Finally, we are unpersuaded by Frazee's contention that
 law enforcement officers provided Longmire with a list of
 questions to ask Frazee. Although the division below appears
 to have accepted Frazee's assertion that Longmire took
 notes on a form provided by the district attorney's
 office, see Frazee, ¶ 44, in our view, and with
 respect, the record demonstrates otherwise. Specifically, as
 noted above, Longmire used a standardized list of fourteen
 questions that the Department employs during such interviews,
 and the People introduced into evidence at the suppression
 hearing a blank form containing these standardized questions.
The portion of the transcript on which Frazee relies
 establishes nothing more than that when Longmire could not
 remember a detail during her testimony,

the People refreshed her recollection with the assessment
 summary that she had provided to law enforcement. At
 no point did Longmire or the prosecutor state that the
 district attorney's office had created the assessment
 form that Longmire was to use. Nor do we perceive anything in
 the record to support an allegation that law enforcement
 officials provided such a form to Longmire prior to her
 meeting with Frazee.

 III.
Conclusion

 ¶43
 For these reasons, we conclude that Longmire did not act
 either as a law enforcement officer or as an agent of law
 enforcement when she met with Frazee. Accordingly, she had no
 obligation to provide Frazee with Miranda warnings
 before speaking with him. In light of the foregoing, we need
 not reach the question of whether Frazee was in custody for
 Miranda purposes.

 ¶44
 Accordingly, we affirm the judgment of the division below,
 albeit on different grounds.