The PEOPLE of the State of Colorado,
Plaintiff–Appellant,

v.

Jonathan Edward MATHENY,
Defendant–Appellee.

No. 01SA355.

Supreme Court of Colorado,
En Banc.

May 20, 2002.

Edward J. Rodgers, District Attorney Eleventh Judicial District, Charles M. Barton, Deputy District Attorney, Sean P. Paris, Deputy District Attorney, Fairplay, Colorado, Attorney for Plaintiff–Appellant.

Gentry & Haskins, LLP, Elvin L. Gentry, Thomas M. Haskins, Colorado Springs, Colorado, Attorney for Defendant–Appellee.

Justice RICE delivered the Opinion of the Court.

In this interlocutory appeal filed pursuant to C.A.R. 4.1, the prosecution challenges an order of the Park County District Court suppressing all statements made by Defendant, Jonathan Matheny, to investigators during a videotaped interview with police at the headquarters of the Colorado Springs Police Department. The trial court ruled that these statements must be suppressed because they were obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). For the reasons set forth below, we hold that Defendant was not in custody within the meaning of *Miranda* until he was formally placed under arrest. Statements Defendant made before he was arrested are therefore admissible in the prosecution's case-in-chief; statements Defendant made after he was arrested are not. Accordingly, we affirm in part, reverse in part, and remand this case for further proceedings consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In a twenty-seven count indictment, the prosecution charges Defendant with various offenses—including first degree murder and conspiracy to commit murder—in conjunction with the deaths of Anthony Dutcher and his grandparents, Carl and Joanna. Isaac Grimes, an acquaintance of Defendant, confessed to killing Anthony Dutcher and implicated Defendant in the deaths of Carl and Joanna Dutcher. As a result, Agent David Sadar, an investigator with the Colorado Bureau of Investigation contacted Defendant at his place of employment, Carl's Jr. restaurant. Although there were four officers present at Carl's Jr., none was in uniform, and only Agent Sadar, with whom Defendant was already familiar,[1] approached the counter.

Agent Sadar asked the manager if he could speak with Defendant. When Defendant came to the counter, Agent Sadar testified that he asked Defendant "if he had time to come and talk with us at the Colorado Springs Police Department ... about the Dutcher case." (Record of October 16, 2001 proceeding at p. 11.) Defendant asked his manager for permission to leave work for this purpose; the manager agreed, and Defendant punched his time card.

After calling his mother and asking her to meet him at the police station, Defendant drove himself and Agent Sadar to the Colorado Springs Police Department. Agent Sadar testified that they did not speak about the Dutchers on the way to the station, instead conversing mostly about the condition of Defendant's car.

The Colorado Springs Police Department is by all accounts a secure facility, and the trial court so noted. *See* (R. of October 16, 2001 proceeding at p. 72.) Access to certain areas is restricted such that moving from one area to another within the building requires security clearance. Thus, when Agent Sadar and Defendant arrived at the Colorado Springs Police Department, they had to be escorted to an interview room on the third or fourth floor where Defendant was told to wait. His mother arrived approximately twenty minutes later at 7:05 p.m., and the interview, which was videotaped, and which we have reviewed, began.

Agent Sadar informed Defendant and his mother they were "free to leave at any time"

---

1. Agent Sadar had previously interviewed Defendant concerning the Dutcher homicides. That interview took place in the school counselor's office at Palmer High School. Agent Sadar was alone and dressed in plain clothes. The school counselor sent a runner to notify Defendant that Agent Sadar wished to speak with him. The two spoke privately in the school counselor's office.

and that Defendant was "not under arrest."[2] During the hour and a half Defendant and his mother spoke with police before he was arrested, neither Defendant nor his mother ever asked to leave. Police officers, on the other hand, entered and exited the room numerous times during the interview. Defendant, sitting forward in his chair with his hands on the table, reiterated what he had already told Agent Sadar at Palmer High School, first to Agent Sadar and Agent Dave Dauenhauer, also with the Colorado Bureau of Investigation, and then to Leonard Post, an investigator with the district attorney's office in the Eleventh Judicial District. Quite articulately and largely in narrative form, Defendant explained that on New Year's Eve, the night the Dutchers were killed, he had met Isaac Grimes at Carl's Jr. From there, they drove to Glen Urban's garage where they drank some rum. Grimes had too much to drink, so they returned to Defendant's residence at approximately 9:00 p.m. Defendant told the investigators that he and Grimes fell asleep and remained at his house until 6:30 or 7:00 a.m. New Year's Day. Convinced that this version of events was untrue, Investigator Post placed Defendant under arrest at approximately 8:30 p.m.[3]

The trial court found that the officers' "general tone of voice was soft"; that their "general demeanor was polite"; and that the words they spoke to Defendant were "entirely reasonable." "[T]hey didn't threaten"; "they didn't yell"; "there was no pounding of the table and so forth;" nor were any false promises made to Defendant. In fact, the trial court found that the law enforcement agents conducting the interview were completely honest with Defendant and did not engage in any untoward or coercive conduct. Moreover, "there were no directions given to the defendant" and "no restraint placed upon" him. As for Defendant, the trial court found that he was "leaning forward at the table"; that he was "verbal" and "articulate"; and that he did not appear to be "tired, hungry or coerced in any matter." Nevertheless, the trial court held that Defendant was in custody for *Miranda* purposes. Because it also ruled that Defendant had not been adequately advised of his *Miranda* rights, the trial court ordered all statements Defendant made during the course of the interview suppressed.

Although the trial court purports to apply an objective standard, the record of the October 16, 2001 proceeding clearly indicates that its decision was based primarily on the subjective intent of the officers: "I want it clear for the record that I'm placing heavy emphasis on ... [the fact that the police officers] intended to hold Mr. Matheny right from the beginning." As a result, the prosecution filed a motion for reconsideration. In denying this motion the court explained:

While the Court indeed found that the officers intended to hold the Defendant in custody before the interview even started, the Court also found that the indicia of an in custody interrogation were objectively present, given the totality of the circumstances. To the extent that the People argue that the officers did not intend to hold Mr. Matheny at the commencement of the interview, the Court makes credibility findings to the contrary.

We hold that Defendant was not in custody within the meaning of *Miranda* until Investigator Post placed him under arrest. Statements Defendant made before he was arrested are admissible in the prosecution's case-in-chief; statements Defendant made after he was arrested are not.

## II. VALIDITY OF PROSECUTION'S C.A.R. 4.1 CERTIFICATION

■ As a preliminary matter, we consider Defendant's contention that the prosecu-

---

**2.** In addition, Agent Sadar advised Defendant that "[y]ou could answer or not answer"; that "[i]f you thought an attorney was in order, you're more than welcome to ask for one"; that "if you couldn't afford one, we would find one for you"; and that "[s]ince you're a juvenile and your mom is here, anytime you want to talk to her ... in private, we will see that you're afforded that opportunity." The trial court ruled that these "warnings" did not satisfy *Miranda*, and the prosecution does not contest this ruling. We therefore do not consider this issue further.

**3.** At 8:28 p.m., Investigator Post stated, "Alright. We're gonna end it with that. You, you're arrested."

tion is not entitled to maintain this interlocutory appeal. C.A.R. 4.1 permits the state to file an interlocutory appeal in this court from a district court order suppressing statements made by the defendant on the ground that they were obtained in violation of *Miranda.* *See, e.g., People v. Thiret,* 685 P.2d 193 (Colo. 1984). However, the appeal must not be taken for purposes of delay and the evidence must be a substantial part of the proof of the charges pending against the defendant. *See* C.A.R. 4.1(a); *People v. Garner,* 736 P.2d 413, 414 (Colo.1987) ("Because the suppressed statements are not a substantial part of the prosecution's proof, the trial court's ruling does not fall within that limited category of cases that we review on interlocutory appeal."). We will refuse to entertain an interlocutory appeal under C.A.R. 4.1 where the prosecution's certification is in the form, and contains the words, required by C.A.R. 4.1(a), but the prosecution's brief and the record do not support this certification. *Garner,* 736 P.2d at 413; *see also People v. Valdez,* 621 P.2d 332, 333 (Colo.1981). Here, however, it is clear that the statements suppressed by the district court are a substantial part of the proof against Defendant.

For instance, count VIII of the indictment alleges that Defendant conspired with Grimes to murder the Dutchers. During the interview, Defendant told investigators the same account of his and Grimes's whereabouts the night of the murders that Grimes had told them before recanting and confessing to the murder of Anthony Dutcher. For purposes of our review, we will assume, without deciding that Defendant's account of events is false.[4] Evidence that Defendant and Grimes jointly fabricated an alibi would be a substantial part of the proof of the charge of conspiracy to commit murder. Moreover, whether true or false, the videotaped confession is probative of Defendant's credibility. *See People v. Dist. Court,* 785 P.2d 141, 144 (Colo.1990) (holding that "statements suppressed by the trial court constitute a substantial part of the proof of the charges pending against the defendant because the credibility of the victims and the

defendant will be of central importance to the trier of fact"). This appeal is therefore proper under C.A.R. 4.1.

## III. STANDARD OF REVIEW

The prosecution maintains that although a trial court's findings of historical fact are entitled to deference by a reviewing court and will not be overturned if supported by competent evidence in the record, whether a person has been subjected to custodial interrogation in violation of *Miranda* is a question of law that should be reviewed de novo. Under this standard, the prosecution contends that the trial court's suppression of Defendant's statements must be reversed because he was never subjected to custodial interrogation. Defendant, in contrast, argues that the issue of custody is essentially a factual question which involves a trial court's assessment of the credibility of witnesses and the weighing of their testimony. Accordingly, he claims that the determination to be made by this court is whether the trial court's findings of historical fact are adequately supported by competent evidence and whether the court applied the correct legal standard to these findings in resolving the issue before it. Under this standard, Defendant argues that we must affirm the suppression order because the trial court's determination was supported by competent evidence and because the trial court applied the correct legal standard.

Support for both these positions can be found in our cases discussing the standard of review applicable to a trial court's ruling on a motion to suppress a custodial statement. *Compare People v. Gennings,* 808 P.2d 839, 844, 845 (Colo.1991) (holding that "an ultimate legal conclusion of constitutional law" is subject to correction on appeal and therefore reviewing trial court's custody determination de novo), *and People v. Milhollin,* 751 P.2d 43, 50–51 (Colo.1988) (holding that trial court's custody determination is subject to correction on appeal because this "ultimate constitutional ruling cannot be squared with

---

4. The prosecution contends in its reply brief that Defendant's account of his whereabouts at the time of the murders is demonstratively false by

independent evidence not of record before this court.

the court's evidentiary findings of fact"), *with People v. Trujillo*, 938 P.2d 117, 123 (Colo. 1997) (holding that issue of custodial interrogation is essentially a factual question and limiting appellate review to determining whether trial court's findings of historical fact are supported by the record and whether the court applied the correct legal standard to these findings in resolving the issue before it), *and People v. LaFrankie*, 858 P.2d 702, 706 (Colo.1993) (holding that a trial court's "finding" on the issue of custody "is essentially a factual question" and "will not be reversed on appeal when supported by competent evidence and when the trial court applied the correct legal standard").[5] We therefore take this opportunity to clarify the standard of review for custody determinations.

■ The ambiguity in our case law appears to stem from confusion over whether to characterize the *Miranda* custody determination as primarily factual or primarily legal in nature. In truth, it, like many other constitutional inquiries whether a search or seizure was reasonable, whether an officer had consent to search, whether a statement was voluntary, whether a suspect in police custody has "knowingly, voluntarily, and intelligently" waived his *Miranda* rights, whether a suspect in police custody sufficiently invoked his right to counsel or to remain silent, and whether a suspect in police custody was interrogated—is a little of both, and attempting to characterize the custody determination as exclusively factual or exclusively legal ignores the true nature of the task at hand.

■ Determining whether a person is in custody "involves relating the legal standard of conduct to the facts established by the evidence." Henry P. Monaghan, *Constitutional Fact Review*, 85 Colum. L.Rev. 229, 234–36 (1985). Law application, as this undertaking is otherwise known, is analytically distinct from the other two tasks courts typically engage in when they decide a case, law declaration and fact identification. *Id.* Whereas law declaration is clearly the prerogative of appellate courts, and fact identification is clearly the prerogative of trial courts or juries as the case may be, a good argument could be made for locating law application in either the trial or appellate courts. However, at least when a constitutional right is implicated, we are persuaded by the arguments of the United States Supreme Court, the federal circuit courts, and our sister states that appellate courts should not defer to a lower court's judgment when applying legal standards to the facts found by the trial court. Therefore, we hold that whether a person is in custody should be reviewed by appellate courts de novo.

In order to resolve a split among the circuit courts, the United States Supreme Court decided the precise issue before us today in *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). There, the Court explained that two discrete inquiries are essential to the ultimate "in custody" determination for *Miranda* purposes. "[F]irst, what were the circumstances surrounding the interrogation." *Keohane*, 516 U.S. at 112, 116 S.Ct. 457. This inquiry, "all agree, is distinctly factual." *Id.* But, "[o]nce the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve 'the ultimate legal inquiry' ": given these circumstances, " '[was] there a "formal arrest or restraint on freedom of movement" of the degree associated with a formal arrest.' " *Id.* (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam))). This second inquiry "calls for application of the controlling legal standard to the historical facts." *Id.* This ultimate determination, the Supreme Court held, "presents a 'mixed question of

---

5. In addition, there is language in *People v. J.D.*, 989 P.2d 762 (Colo.1999) that would support either standard:

Where the trial court utilizes the correct legal standard, and its conclusion is supported by evidence in the record, we will not reverse its ruling on appeal. However, when the trial court fails to fully apply the correct standard ... its ruling cannot stand. Where the findings are sufficient and supported by the record, an appellate court can review the matter and decide the issue as a matter of law.

989 P.2d at 769.

law and fact' qualifying for independent review." *Id.* at 113, 116 S.Ct. 457.

Elaborating on the justification for its conclusion the Court reasoned that

the trial court's superior capacity to resolve credibility issues is not dispositive of the "in custody" inquiry. Credibility determinations ... may sometimes contribute to the establishment of the historical facts and thus to identification of the "totality of the circumstances." But the crucial question entails an evaluation made after determination of those circumstances: if encountered by a "reasonable person," would the identified circumstances add up to custody as defined in *Miranda?*

*Keohane,* 516 U.S. at 113, 116 S.Ct. 457 (internal citations and footnotes omitted); *cf. Ornelas v. United States,* 517 U.S. 690, 696–99, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) (relying on same rationale in support of holding that federal trial court's probable cause and reasonable suspicion determinations should be reviewed de novo). Likewise, "the trial court does not have a first-person vantage on whether a defendant was 'in custody' for *Miranda* purposes." *Id.* at 114, 116 S.Ct. 457.

Furthermore, the Court continued, " 'in custody determinations ... guide future decisions.' " *Id.* Judges make "in custody" assessments for *Miranda* purposes "with a view to identifying recurrent patterns, and advancing uniform outcomes." *Id.* "If they cannot supply a 'definite rule,' they nonetheless can reduce the area of uncertainty." *Id.* Thus, by guiding police, unifying precedent, and stabilizing the law, "[c]lassifying 'in custody' as a determination qualifying for independent review should serve legitimate law enforcement interests as effectively as it serves to ensure protection of the right against self-incrimination." *Id.; see also* Monaghan, *supra,* at 273 ("[N]orm elaboration occurs best when the Court has power to consider fully a series of closely related situations involving a claim of constitutional privilege."). Accordingly, the Court concluded that "once the historical facts are resolved, the state court is not in an appreciably better position than the federal habeas court to make [the ultimate] determination of the con-

sistency of the law enforcement officer's conduct with the federal *Miranda* warning requirement." *Keohane,* 516 U.S. at 115, 116 S.Ct. 457.

Although *Keohane* was decided in the habeas corpus context, its reasoning is applicable here. In fact, to reach its holding, *Keohane* itself relied on the fact that it had also treated the "in custody" question as one of law on direct appeals from the states. 516 U.S. at 115, 116 S.Ct. 457 (citing *Mathiason* and *Beheler* as examples). And in *Ornelas,* the Court relied on rationales quite similar to those expressed in *Keohane* to substantiate its conclusion that a federal district court's suppression ruling on the "ultimate questions" of reasonable suspicion and probable cause to make a warrantless search should be reviewed de novo by federal appellate courts. *See Ornelas,* 517 U.S. at 696–99, 116 S.Ct. 1657.

Finally, the federal circuit courts have treated *Keohane* and *Ornelas* as binding on this issue in all procedural orientations. For instance, in *United States v. Erving L.,* 147 F.3d 1240 (10th Cir.1998), the Tenth Circuit reconsidered the proper standard of review for a federal district court's ultimate "in custody" determination in light of *Keohane* and *Ornelas.* 147 F.3d at 1244–45. Before these decisions, the Tenth Circuit had held that a federal district court's custody determination was a factual determination that would be reviewed for clear error. *See Cordoba v. Hanrahan,* 910 F.2d 691, 693 (10th Cir.1990); *United States v. Chalan,* 812 F.2d 1302, 1307 (10th Cir.1987). *Keohane* and *Ornelas,* the panel concluded, required that the "clearly erroneous" standard for custody determinations be overruled: "Taken together, [*Keohane*] and *Ornelas* establish that when reviewing a district court's application of law to establish historical fact, as in the 'in custody' determination at issue here, Courts of Appeals must employ a *de novo* standard." *Erving L.,* 147 F.3d at 1246; *see also United States v. Fernandez–Ventura,* 132 F.3d 844, 846 (1st Cir.1998); *United States v. Yusuff,* 96 F.3d 982, 987–88 (7th Cir.1996). In so ruling, the panel rejected the appellee's argument that *Keohane* is only applicable in the habeas corpus context:

[*Keohane* ] … cannot be minimized by pigeonholing it as a procedural ruling for federal habeas review of state court decisions. A careful reading of the opinion reveals the basis of [*Keohane* ] is that resolution of custody is ultimately a mixed question of fact and law to be reviewed de novo.

*Erving L.*, 147 F.3d at 1245; *see also Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir.1991) ("In both direct and collateral review, the question whether the trial court's determination is factual or legal is the same.")

Today, the vast majority of jurisdictions that have addressed this issue are in accord with *Keohane*. *See State v. Smith*, 38 P.3d 1149, 1153 (Alaska 2002); *People v. Ochoa*, 19 Cal.4th 353, 79 Cal.Rptr.2d 408, 966 P.2d 442, 470–71 (1998); *State v. Pinder*, 250 Conn. 385, 736 A.2d 857, 873–74 (1999); *United States v. Turner*, 761 A.2d 845, 850 (D.C. 2000); *Connor v. State*, 803 So.2d 598, 605–08 (Fla.2001); *State v. Wintker*, 223 Ga.App. 65, 476 S.E.2d 835, 837–38 (1996); *State v. Frank*, 133 Idaho 364, 986 P.2d 1030, 1035 (App.1999); *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997); *State v. Holloway*, 760 A.2d 223, 228 (Me.2000); *Bond v. State*, 142 Md.App. 219, 788 A.2d 705, 709 (2002); *Commonwealth v. Morse*, 427 Mass. 117, 691 N.E.2d 566, 570–73 (1998); *People v. Coomer*, 245 Mich.App. 206, 627 N.W.2d 612, 620 (2001); *State v. Wiernasz*, 584 N.W.2d 1, 3 (Minn.1998); *State v. Werner*, 9 S.W.3d 590, 595 (Mo.2000); *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615, 627 (2000); *State v. Ford*, 144 N.H. 57, 738 A.2d 937, 942 (1999); *State v. Nieto*, 129 N.M. 688, 12 P.3d 442, 448 (2000); *State v. Greene*, 332 N.C. 565, 422 S.E.2d 730, 737 (1992); *State v. Eldred*, 564 N.W.2d 283, 287 (N.D.1997); *State v. Pudelski*, No. 77932, 2001 Ohio App. Lexis 1156, at *21 (Ohio Ct.App.2001); *Commonwealth v. Kuzmanko*, 709 A.2d 392, 396 (Pa.Super.Ct.1998); *State v. Herting*, 604 N.W.2d 863, 864 (S.D.2000); *Garza v. State*, 34 S.W.3d 591, 593 (Tex.App.2000); *State v. Wood*, 868 P.2d 70, 83 (Utah 1993), *overruled on other grounds, State v. Mirquet*, 914 P.2d 1144, 1147 (Utah 1996); *King v. Commonwealth*, No. 2619–97–1, 1998 WL 842231, at *1, 1998 Va.App. Lexis 618, at *4 (Va.Ct.App. Dec.8, 1998); *State v. Potter*, 197 W.Va. 734, 478 S.E.2d 742, 752 (1996); *Kolb v. State*, 930 P.2d 1238, 1243 (Wyo.1996).

As the preceding discussion demonstrates, the obligation to independently review mixed questions of law and fact that implicate constitutional rights is an extremely important appellate principle. In *People v. Quezada*, 731 P.2d 730 (Colo.1987), we acknowledged that "in reaching a decision on a motion to suppress a custodial statement, a court must engage both in factfinding … and law application." 731 P.2d at 732. Because factfinding requires a specific inquiry into the historical phenomenon of the case, we held that "a court's findings of historical fact are entitled to deference by a reviewing court and will not be overturned if supported by competent evidence in the record." *Id.* In contrast, an ultimate conclusion of constitutional law often requires the application of the controlling legal standard to facts established by the evidence and already found by the trial court. *Id.* Where it does, it is subject to correction by a reviewing court if it is inconsistent with or unsupported by evidentiary findings. *Id.; accord People v. Gonzales*, 987 P.2d 239, 242 (Colo.1999) ("When reviewing a trial court's order to suppress an inculpatory statement, the court reviews both factfinding and the application of law. While we defer to a trial court's findings of disputed fact, the application of a legal standard to historical fact is a matter for de novo appellate review.").

Consistent with our approach in *Quezada*, we have fulfilled our obligation to independently review mixed questions of law and fact repeatedly and in a variety of contexts. Whether an officer has probable cause or reasonable suspicion to conduct a search or effect a seizure are mixed questions of law and fact with constitutional implications that we have reviewed de novo. *People v. King*, 16 P.3d 807 (Colo.2001); *People v. D.F.*, 933 P.2d 9 (Colo.1997). We have reviewed the ultimate inquiry under the Fourth Amendment, the reasonableness of a search or seizure, de novo as well. *See People v. Ortega*, 34 P.3d 986 (Colo.2001); *People v. Hopkins*, 870 P.2d 478 (Colo.1994). In the context of the Fifth Amendment, whether

police have scrupulously honored the right of a suspect to cut off police questioning has been subject to our de novo review. *Quezada,* 731 P.2d 730. Whether a suspect has validly waived his *Miranda* rights is yet another question we have reviewed de novo. *See People v. Owens,* 969 P.2d 704 (Colo. 1999). The ultimate conclusion of constitutional law that a suspect's confession was involuntary has also been subject to our de novo review. *People v. Valdez,* 969 P.2d 208 (Colo.1998). Finally, we have independently reviewed whether an officer's words and conduct constituted the functional equivalent of interrogation for *Miranda* purposes. *People v. Gonzales,* 987 P.2d 239 (Colo.1999); *see also People v. Rivas,* 13 P.3d 315, 320 (Colo. 2000) (reviewing de novo the trial court's conclusion that a suspect's statements were the product of custodial interrogation).

There is no reason why we should conduct our review of a trial court's custody determination any differently than we review these other constitutionally based mixed questions of law and fact. As an appellate court, we will not engage in fact finding, and thus, a trial court's findings of historical fact are entitled to deference by a reviewing court and will not be overturned if supported by competent evidence in the record. *Quezada,* 731 P.2d at 732. However, law application, which involves the application of the controlling legal standard to the facts established by the evidence and found by the trial court is a matter for de novo appellate review, at least where constitutional rights are concerned. *Id.; Gonzales,* 987 P.2d at 242. Determining whether a person is in custody for *Miranda* purposes is a mixed question of law and fact with constitutional implications that requires us to apply a controlling legal standard to the facts found by the trial court. Accordingly, we hold that it should be reviewed de novo by the appellate courts of this state. Our holding comports with the vast weight of authority on this issue, including the United States Supreme Court, and resolves the uncertainty in our case law. Having settled this preliminary matter, we now turn our attention to the merits of the case before us.

## IV. CUSTODY DETERMINATIONS UNDER *MIRANDA*

To protect a suspect's Fifth Amendment right against self-incrimination, *Miranda* prohibits the prosecution from introducing in its case-in-chief any statement, whether inculpatory or exculpatory, procured by custodial interrogation, unless the police precede their interrogation with certain warnings. 384 U.S. at 444, 86 S.Ct. 1602. They must advise the subject that he has the right to remain silent; that anything he says may be used against him; that he has the right to the presence of an attorney; and that if he cannot afford one, one will be appointed for him. *Id. Miranda* is a constitutional decision, and state law enforcement officers are bound by its strictures. *See Dickerson v. United States,* 530 U.S. 428, 432, 438–39, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

*Miranda* identified the principal threat to the privilege against self-incrimination as the compulsive effect of psychological coercion applied during incommunicado interrogation. *Miranda,* 384 U.S. at 461, 86 S.Ct. 1602. These tactics, the court concluded, serve no purpose other than to "subjugate the individual to the will of his examiner." *Miranda,* 384 U.S. at 457, 86 S.Ct. 1602. After enumerating examples of psychological coercion impacting the privilege against self-incrimination, the Court emphasized the coercive aspects of custodial interrogation with which it was most concerned—deprivation of the suspect's freedom followed by his isolation from friends and family:

> An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to ... techniques of persuasion ... cannot be otherwise than under compulsion to speak. As a practical matter, the compulsion to speak in the isolated setting of the police station may well be greater than ... where there are ... impartial observers to guard against intimidation or trickery.

384 U.S. at 461, 86 S.Ct. 1602; *see also Illinois v. Perkins,* 496 U.S. 292, 296, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990) (recognizing that the " 'principal psychological factor contributing to a successful interrogation is

privacy being alone with the person under interrogation' " (quoting *Miranda*, 384 U.S. at 449, 86 S.Ct. 1602)). In succeeding opinions, the Supreme Court has had occasion to emphasize this point, delineating the limits of *Miranda* in the process.

In *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam), for example, the United States Supreme Court summarily concluded that the Oregon Supreme Court had read *Miranda* too broadly in concluding that the defendant was "in custody" for *Miranda* purposes. 429 U.S. at 493, 97 S.Ct. 711. The defendant was a suspect in a burglary investigation. *Id.* After trying to contact the defendant three or four times, an officer investigating the theft finally left a note asking the defendant to call and informing him that the police wished to discuss something with him. *Id.* When the defendant called the following afternoon, the officer asked if the defendant could meet him at the state patrol office. *Id.* The officer met the defendant in the hallway of the patrol office and took him into an office and closed the door. *Id.* The officer informed the defendant that he was not under arrest. *Id.* He told the defendant that he was suspected in the burglary and that telling the truth might be considered by the district attorney or judge. *Id.* Finally, the officer falsely informed the defendant that his fingerprints were found at the scene of the burglary. *Id.* As a result, the defendant confessed. *Id.* They had only been in the office for approximately five minutes. *Id.*

Holding that this scenario did not constitute custodial interrogation as envisioned by *Miranda* the court explained:

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers

are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is the one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

429 U.S. at 495, 97 S.Ct. 711. The fact that the defendant came voluntarily to the police station and was informed that he was not under arrest was important to the Court's conclusion. *Id.*

These same factors contributed to the Court's conclusion that the defendant in *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam) was not in custody either. Indeed, *Beheler's* facts were virtually identical to those of *Mathiason:* the defendant voluntarily came to the police station, he was specifically told he was not under arrest, and he was allowed to leave after the interview. 463 U.S. at 1122–23, 103 S.Ct. 3517. In *Beheler*, however, the interview lasted closer to thirty minutes. *Id.* at 1122, 103 S.Ct. 3517. Nevertheless, the court held that the defendant was not in custody for *Miranda* purposes. *Id.* at 1126, 103 S.Ct. 3517. "*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' " *Id.* at 1125, 103 S.Ct. 3517 (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711). The "ultimate inquiry" for determining whether a person is "in custody" for purposes of receiving *Miranda* protection, the Court held, is simply "whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.* (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711.)

*Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), like *Mathiason* and *Beheler*, reiterated that *Miranda* was decided in reference to those situations exerting "upon a detained person pressures

that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." 468 U.S. at 437, 104 S.Ct. 3138. Accordingly, *Berkemer* too recognized that the pertinent inquiry is whether a reasonable person in the suspect's position would believe that his freedom of action had been curtailed to a degree associated with a formal arrest. *Id.* at 440, 104 S.Ct. 3138. However, unlike *Mathiason* and *Beheler*, which explicated the degree of restraint on freedom necessary to trigger *Miranda, Berkemer* emphasized that the incommunicado nature of police interrogation was an important underpinning of the *Miranda* decision. The Court distinguished roadside questioning at issue in *Berkemer* from custodial interrogation on the ground that "circumstances associated with the typical traffic stop are not such that the motorist feels completely at the mercy of the police." *Id.* at 438, 104 S.Ct. 3138. The Court reasoned that "exposure to public view both reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse." *Id.*

The rule derived from two other Supreme Court cases interpreting *Miranda* is also helpful in resolving the issue before us today. In *Beckwith v. United States,* 425 U.S. 341, 346–47, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the Court made clear that "[i]t was the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions at the time the questioning was conducted, which led the Court to impose the *Miranda* requirements with regard to custodial questioning." *Id.* In *Stansbury v. California,* 511 U.S. 318, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (per curiam), the court expounded this principle. *Stansbury* is particularly relevant to the facts of the case before us.

In *Stansbury,* the defendant was contacted at 11:00 p.m. at his home by three plainclothes officers. 511 U.S. at 320, 114 S.Ct. 1526. The officers informed the defendant that they were investigating a homicide and that he was a possible witness. *Id.* They requested that he accompany them to the police station to answer some questions. The defendant agreed and accepted a ride to the station in the front seat of one of the officers' police car. *Id.* At the station, the defendant was interrogated without first being advised of his *Miranda* rights; he made incriminating statements and was arrested. *Id.* at 320–21, 114 S.Ct. 1526.

The trial court refused to suppress statements made by the defendant before his responses to the officers' questions caused the focus of the investigation to shift toward him. *Id.* at 321, 114 S.Ct. 1526. The defendant was not in custody, the trial court held, until the defendant himself was suspected of the crime. *Id.* The California Supreme Court affirmed, agreeing that the defendant was not in custody until the investigation focused on him. *Id.* at 321–22, 114 S.Ct. 1526. The United States Supreme Court reversed.

The Supreme Court began by reciting the black letter test for whether a suspect is in custody: "a court must examine all of the circumstances surrounding the interrogation, but the ultimate inquiry is simply whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Id.* at 322, 114 S.Ct. 1526 (internal quotation marks omitted). Reiterating the *Beckwith* principle, the court continued, "Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Id.* at 323, 114 S.Ct. 1526. "A policeman's unarticulated plan has no bearing on the question of whether a suspect was 'in custody' at a particular time; rather, the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 323–24, 114 S.Ct. 1526 (internal quotation marks omitted). Of course, "an officer's knowledge or beliefs may bear upon the custody issue if they are conveyed, by word or deed, to the individual being questioned," but "only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of

action." *Id.* at 325, 114 S.Ct. 1526. Illuminating this point, the Court opined that:

> Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest. The weight and pertinence of any communications regarding the officer's degree of suspicion will depend upon the facts and circumstances of the particular case.

*Id.*

On remand, ignoring the subjective intent of the officers as the United States Supreme Court instructed, the California Supreme Court engaged in an objective analysis of the totality of the circumstances to determine whether a reasonable person in the suspect's position would have felt that his freedom of action had been curtailed to a degree associated with a formal arrest. *People v. Stansbury,* 9 Cal.4th 824, 38 Cal.Rptr.2d 394, 889 P.2d 588, 591 (1995). Under this standard, the California Supreme Court concluded that the defendant was not in custody for *Miranda* purposes. *Id.* 38 Cal.Rptr.2d 394, 889 P.2d at 594. California's high court took into account the fact that "Defendant was invited, not commanded, to come to the police station for an interview"; that "defendant was offered the choice of driving himself or accepting a ride from the police"; that upon accepting a ride, "he sat in the front seat of the car"; that he was told he was being interviewed as "a possible witness"; that the questioning was "brief and nonaccusatory, notwithstanding that it took place in the jail area of the police station;" and that "defendant was largely permitted to recount his observations and actions through narrative." *Id.* 38 Cal.Rptr.2d 394, 889 P.2d at 591–92. The court did not find persuasive the defendant's argument that the interrogation was custodial simply because he had to pass through a locked parking structure and a locked entrance to the jail to get to the interview room where he made his statement. *Id.* 38 Cal.Rptr.2d 394, 889 P.2d at 593. "Here, although defendant had been admitted to the jail section of the police station through locked doors and would have

needed assistance to leave the facility, these facts alone do not establish that he was in custody." *Id.* 38 Cal.Rptr.2d 394, 889 P.2d at 594. "There is no evidence to indicate that a reasonable person in his position would feel that assistance in leaving the facility would not be forthcoming." *Id.; see also Green v. Superior Court,* 40 Cal.3d 126, 219 Cal.Rptr. 186, 707 P.2d 248, 255 (1985) (holding questioning in a locked interview room in police station to be noncustodial where record did not reveal whether the defendant realized that room was locked).

A handful of times, we have had occasion to review a trial court's determination that a suspect was or was not in custody during a station house interview. Although none is directly on point, a few are informative in some regards. The most factually similar case we have considered is *People v. Trujillo,* 938 P.2d 117 (Colo.1997). There, the defendant and the investigating detective agreed to meet at the police station to discuss an alleged sexual assault. 938 P.2d at 120. When he arrived, the defendant was escorted through a locked door and into an interview room. *Id.* He was informed that he was not under arrest, that he was free to leave, and that the interview would take place only if the defendant wanted to talk. *Id.* at 120–21.

We made clear that the objective reasonable person standard applies to the issue of custody. *Id.* at 123. The reasonable person standard, we explained, is superior to a subjective test because it is not " 'solely dependent either on the self-serving declarations of the police officers or the defendant.' " *Id.* (quoting *Berkemer,* 468 U.S. at 442 n. 35, 104 S.Ct. 3138); *accord Hamilton,* 831 P.2d at 1330; *Trujillo,* 785 P.2d at 1293. Some of the factors a court should consider under this standard are:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions

asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Trujillo,* 938 P.2d at 124. Because none of these factors is determinative, we held that a "police interrogation at a stationhouse does not necessarily render the interrogation custodial for purposes of the Miranda warning." *Id.* (citing *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711). We concluded that the undisputed facts in the record did not support the trial court's conclusion that the defendant was in custody. *Id.* For instance, we pointed out that the interview occurred at the police station by mutual agreement; that the defendant was informed that he was not under arrest and was free to leave; that the defendant was relaxed; and that the initial tone of the interview was conversational. *Id.* Nevertheless, we remanded the case to the trial court for further findings of fact because it had failed to resolve conflicting testimony. *Id.* at 125. Specifically, the defendant's and the investigator's accounts of the interview differed vastly and it was unclear whether or not the door to the interview room was locked. *Id.* at 124–25.

The fact that the defendant voluntarily came to the police station and was free to leave at anytime was important in *People v.*

*Thiret,* 685 P.2d 193 (Colo.1984), too. In *Thiret,* the defendant was questioned in the office of an investigator with the district attorney's office after taking a polygraph examination. *Id.* at 198. A police officer had transported the defendant to the district attorney's office for the purpose of the polygraph examination over four hours earlier. *Id.* During the interview, which lasted approximately an hour and a half, the door to the office was closed. *Id.* However, a few minutes after the defendant and the investigator began talking, the officer assigned to drive the defendant home came in and told the defendant to let him know when the defendant was ready to leave. *Id.* In holding that the defendant was not in custody for *Miranda* purposes, we reasoned that the defendant went voluntarily to the district attorney's office to take part in the polygraph examination; that he was not under arrest; and that his freedom to depart was not restricted. *Id.* at 203. "In fact, shortly after the defendant began conversing with [the investigator], another officer told the defendant to let him know when he was ready to leave."[6] *Id.*

■■■ With the principles discussed above to guide us,[7] we now consider whether Defendant's statements were the product of custodial interrogation.[8]

---

**6.** In contrast to *Thiret,* we relied on the fact that the defendant in *Jones v. People,* 711 P.2d 1270 (Colo.1986), was never told he was free to leave in concluding that he had been subjected to custodial interrogation. *Jones,* 711 P.2d at 1276. Likewise, in *People v. Dracon,* 884 P.2d 712 (Colo.1994), we pointed out that the defendant was never advised that she was free to leave, or that she was able to decline the officer's invitation to escort her to the police station, in affirming the trial court's conclusion that she was in custody. 884 P.2d at 717–18. *But see People v. Horn,* 790 P.2d 816, 818–819 (Colo.1990) (refusing to overturn the trial court's ruling that defendant was in custody because trial court's findings were supported by the evidence and it applied the correct legal standard even though the defendant was repeatedly told during the questioning that he was free to leave and that he would not be arrested). Similar to *Jones* and *Dracon,* in *People v. Pease,* 934 P.2d 1374 (Colo.1997), we relied on the fact that the defendant was placed in a locked interview room in "accept[ing] the district court's implicit determination that [the defendant] was in custody when he was interviewed at the police station." 934 P.2d at 1377.

**7.** These principles apply equally to juveniles, which Defendant was at the time of the interview. *People in Interest of J.C.,* 844 P.2d 1185, 1189 (Colo.1993) ("[T]he analysis for custody of an adult, as it has been thoroughly developed over the years, also applies to the custody of a juvenile.").

**8.** There is no question that the investigators' questions in this case were interrogation within the meaning of *Miranda,* and the parties do not dispute this point. *See Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980) (defining interrogation for *Miranda* purposes as "any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect" (internal footnote omitted)). Thus, in order to determine whether *Miranda* warnings were required, we limit our discussion to whether Defendant was in custody at the time of the interview.

## V. APPLICATION

 Pursuant to the United States Supreme Court precedent set forth above, we engage in "[a]n objective assessment of whether a reasonable person in the suspect's position would believe himself to be deprived of his freedom of action to the degree associated with a formal arrest." *People v. Taylor,* 41 P.3d 681, 691 (Colo.2002); *accord People v. Polander,* 41 P.3d 698, 705 (Colo.2001); *People v. Reddersen,* 992 P.2d 1176, 1180 (Colo.2000); *People v. Breidenbach,* 875 P.2d 879, 886 (Colo.1994); *People v. Wallace,* 724 P.2d 670, 673 (Colo.1986). Applying this standard to the facts found by the trial court, we hold that Defendant was not in custody for *Miranda* purposes until Investigator Post placed him under arrest at approximately 8:30 p.m. Statements made by Defendant before this point are admissible in the prosecution's case-in-chief; statements made by Defendant after this point are not.

The totality of the circumstances surrounding the March 8, 2001 interview suggest that Defendant was not in custody until Investigator Post placed him under arrest. Defendant was approached in the late afternoon at his place of employment by an agent with whom he was familiar and by whom he had already been interviewed. He was asked, not told, to come to the police station to further discuss the Dutcher investigation. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *Thiret,* 685 P.2d at 203; *see also Burket v. Angelone,* 208 F.3d 172, 197 (4th Cir.2000); *Trujillo,* 938 P.2d at 124; *Stansbury,* 38 Cal.Rptr.2d 394, 889 P.2d at 591. Defendant agreed to this request and drove himself and Agent Sadar to the station. Once there he was met by his mother, told that he was not under arrest, and that he was free to go at anytime. *See Mathiason,* 429 U.S. at 495, 97 S.Ct. 711; *Thiret,* 685 P.2d at 203; *see also Burket,* 208 F.3d at 197; *Trujillo,* 938 P.2d at 124. These are not indicia that would cause a reasonable person to believe that his freedom of action had been curtailed to a degree associated with a formal arrest.

Although the Colorado Springs Police Station is a secure facility, the trial court noted that officers entered and exited the interview room freely, and there is nothing in the record to suggest that, had Defendant or his mother wanted to leave, they would not have been able to do so. *See Stansbury,* 38 Cal. Rptr.2d 394, 889 P.2d at 594; *see also United States v. Kirsteins,* 906 F.2d 919, 924 (2nd Cir.1990) (disregarding fact that interview took place in a secure federal building because "there was nothing to lead a reasonable person to believe that [the building's security measures] constituted a restraint on leaving"). However, neither expressed such a desire. Instead, Defendant, appearing relaxed and engaged, and with his mother by his side, *see United States v. Erving L.,* 147 F.3d 1240, 1248 (10th Cir.1998) (noting presence of parents as a factor in its conclusion that the defendant was not in custody during interview with police), told investigators his account of events the night of the Dutcher murders, largely in narrative form. *See Stansbury,* 38 Cal.Rptr.2d 394, 889 P.2d at 591–92. As the trial court pointed out, "Defendant did not appear tired, hungry or coerced in any manner."

The officers were completely honest with Defendant. *Cf. Mathiason,* 429 U.S. at 492, 97 S.Ct. 711. They did nothing other than encourage him to tell the truth and warn him of the consequences of lying. The trial court further found that the officers' "general tone of voice was soft"; that their general demeanor was polite; and that the words they spoke to Defendant were "entirely reasonable." "There were no directions given to the defendant," and there was "no restraint placed upon him." Defendant was not in custody when the interview began and, although long, nothing occurred during the interview—up until the time of the arrest—that would convert a noncustodial situation into a custodial one. Thus, we conclude that the trial court's findings of fact cannot be squared with its ultimate conclusion that Defendant was in custody.

 True, the purpose of the interview was to persuade Defendant to admit his involvement in the Dutcher murders; he did not. However, persuasion is not coercion, and the atmosphere and tone of the interview certainly did not evince any attempt by the police to "subjugate the individual to the will of his examiner." *Miranda,* 384 U.S. at 457,

86 S.Ct. 1602. As *Mathiason* acknowledged, "Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." 429 U.S. at 495, 97 S.Ct. 711. However, a consensual interview between a defendant and the police, that takes place in the presence of the defendant's mother, does not exert the compulsive forces *Miranda* sought to prevent. *Id.; see also Berkemer*, 468 U.S. at 437, 104 S.Ct. 3138 (reiterating that *Miranda* applies only to those situations exerting "upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"). The fact that the room where the interview took place happened to be on the third or fourth floor of a secure police station does not alter this conclusion. *See Beheler*, 463 U.S. at 1125, 103 S.Ct. 3517 ("*Miranda* warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.' " (quoting *Mathiason*, 429 U.S. at 495, 97 S.Ct. 711)).

■■■■ Finally, in its initial ruling on the custody issue, the trial court erred in basing its conclusion primarily on its finding that the officers intended to arrest Defendant at the outset of the interview. The Supreme Court made clear in *Stansbury* that an officer's unarticulated plan has no bearing on the question of whether a suspect was "in custody" at a particular time. 511 U.S. at 323–24, 114 S.Ct. 1526.[9] When *Stansbury* was brought to its attention in the prosecution's motion to reconsider, the trial court disclaimed any reliance on the officers' subjective intent and concluded that "the indicia of an in custody interrogation were objective-ly present." However, the trial court does not identify the indicia to which it refers, and does not cite any additional reasons for its conclusion that Defendant was in custody prior to being placed under arrest by Investigator Post.

■■■ A trial court's inquiry when considering whether a defendant is in custody for *Miranda* purposes is limited to whether, under the totality of the circumstances, a reasonable person in the defendant's position would consider himself to be deprived of his freedom of action to the degree associated with a formal arrest.[10] Under this standard, the relevant facts found by the trial court indicate to us that Defendant was not in custody until Investigator Post placed him under arrest. Accordingly, statements Defendant made before this point are admissible in the prosecution's case-in-chief.

It is beyond dispute that Defendant was in custody for *Miranda* purposes once Investigator Post placed him under arrest. Statements made after this point must therefore be suppressed.

## VI. CONCLUSION

We hold that Defendant was not in custody until Investigator Post formally placed Defendant under arrest. Accordingly, we affirm in part, reverse in part, and remand this case to the trial court for further proceedings consistent with this opinion.

Justice MARTINEZ dissents and Chief Justice MULLARKEY joins in the dissent. Justice BENDER does not participate.

Justice MARTINEZ dissenting:

In deciding this case, the majority adopts a de novo standard of review to determine whether a person is in custody for *Miranda*

---

9. Eventually, the officers did inform Defendant that they suspected he was involved in the Dutcher murders. Once conveyed, an officer's suspicion is relevant, but only to the extent it would affect how a reasonable person in the suspect's position would "gauge the breadth of his or her freedom of action." *Stansbury*, 511 U.S. at 325, 114 S.Ct. 1526 (internal quotation marks omitted). Moreover, "[e]ven a clear statement from an officer that the person under interrogation is

a prime suspect is not, in itself, dispositive of the custody issue." *Id.* Although we take this factor into account, we do not consider it to be dispositive in this case.

10. Like a police officer's unarticulated plan to arrest the defendant, whether the defendant is actually arrested at the close of the interview is irrelevant under this standard.

purposes. Because a de novo standard is inconsistent with our prior jurisprudence, I respectfully dissent. Furthermore, after applying the controlling deferential standard of review, I conclude that the trial court erred in holding that Matheny was in custody when the interview began because it applied a subjective standard to determine the issue of custody. However, the evidence does support a finding that the interview may have become custodial during the course of the questioning but before formal arrest. Thus, I would remand to the trial court for a determination of whether Matheny was in custody at a later time, during the course of the interview.

## I.

Initially, I disagree with the majority's adoption of a de novo standard of review for three reasons. First, I find the majority's reliance on *Thompson v. Keohane*, 516 U.S. 99, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995), to be unpersuasive. Second, the issue is not squarely before us. And third, we have a long-standing precedent applying a more deferential standard in reviewing "in custody" determinations. I proceed to discuss each reason in turn.

The majority relies heavily on the United States Supreme Court decision in *Keohane* to support its adoption of a de novo standard. However, I find *Keohane* to be inapplicable. In *Keohane*, the task before the Supreme Court was to decide whether "in custody" determinations were entitled to a presumption of correctness under § 2254(d) of the federal habeas corpus statute, 28 U.S.C. § 2254(d)(1966). *Keohane*, 516 U.S. at 106, 116 S.Ct. 457. Because section 2254(d)'s presumption of correctness applies only to "factual issues," the Court considered whether the issue of custody is one of fact or one of law. *Id.* at 108–09, 112–13, 116 S.Ct. 457. The Court recognized that the issue of custody is neither a question of fact nor a question of law, but rather, a mixed question of law and fact. *Id.* at 112–13, 116 S.Ct. 457. The Court then considered whether it should treat this mixed question of law and fact as an issue of fact, entitled to a presumption of correctness, or as an issue of law, which

qualified for de novo review. *Id.* at 113, 116 S.Ct. 457. For policy reasons, the Court held that the determination of whether a defendant was "in custody" should not be treated as one of fact. *Id.* at 113–16, 116 S.Ct. 457. On the other hand, the dissent found that the policy reasons weighed more heavily in favor of treating such determinations as factual questions. *Id.* at 117–20, 116 S.Ct. 457. Having decided to treat the issue of custody as a question of law, the Court applied a de novo standard of review. *Id.* at 113, 116 S.Ct. 457.

In identifying the governing standard of review, the *Keohane* Court considered only two options: Either the issue was one of fact entitled to § 2254(d)'s presumption of correctness or the issue was one of law for de novo review. In contrast, in deciding upon an appropriate standard of review, we are guided by our prior jurisprudence, which has consistently applied a more deferential standard in reviewing "in custody" determinations. We have found this deferential standard to be the appropriate standard of review for what we have determined to be a mixed question of law and fact, the issue of custody. Thus, because *Keohane* was decided in the context of the federal habeas corpus statute, and thus the Court was guided by legislative directive, I find it is distinguishable from this case and therefore unpersuasive.

In addition, the issue is not squarely before us. Admittedly, the parties do disagree about the standard of review that governs this case. However, this is the result of a misunderstanding of the cases that set forth the standard of review governing "in custody" determinations. The prosecution contends that we have adopted a de novo standard of review for "in custody" determinations. And while the prosecution cites cases to support this contention, these cases address the standard of review for issues other than the issue of custody, and are thus not on point. The defendant, on the other hand, argues that this court has adopted a deferential standard when reviewing "in custody" determinations. Neither party discusses the considerations we should take into account when deciding whether to

change our standard of review. Thus, there is no debate between the parties as to why a particular standard of review is the more appropriate one, but rather just a disagreement as to what is our current standard of review. Because I find that the issue is not before us, I disagree with the majority's decision to address the issue in the first instance.

This is not to say that the question as to the appropriate standard of review of "in custody" determinations is unworthy of review. Further, I recognize that identifying the appropriate standard is a preliminary matter that must be addressed before deciding a case. However, because the parties in this case have not raised, briefed, and debated the issue, I would not use this case as a vehicle to reject our long-standing standard of review and adopt a new one. If this court is inclined to take such action, it should do so in a case in which the issue is properly before us.

Lastly, and most importantly, this court has long adhered to a more deferential standard in reviewing whether a defendant was "in custody" for purposes of *Miranda*. We have consistently held that "[o]ur role on appeal ... is to determine whether the trial court's findings of historical fact are adequately supported by competent evidence and whether the court applied the correct legal standard." *People v. LaFrankie*, 858 P.2d 702, 706 (Colo.1993); *People v. Trujillo*, 784 P.2d 788, 792 (Colo.1990). We have further held that "[a]n ultimate conclusion of constitutional law that is inconsistent with or unsupported by evidentiary findings ... is subject to correction by a reviewing court, as is a court's application of an erroneous legal standard to the facts of [a] case." *People v. Gennings*, 808 P.2d 839, 844 (Colo.1991); *People v. Milhollin*, 751 P.2d 43, 50 (Colo. 1988).

Thus, our standard of review for custody determinations requires a three-part analysis. First, we review the record to determine whether the trial court's factual findings are supported by competent evidence. Second, we look to whether the trial court articulated the correct legal standard and fully applied this standard. If the factual findings are supported by the record and the trial court fully applied the correct legal standard, and thus the ultimate conclusion is supported by the evidentiary findings, no further inquiry is necessary and we apply a deferential standard. Third, if the trial court erred by either applying the incorrect standard or by failing to fully apply the correct standard, and if the findings of fact are sufficient and supported by the record, we may decide the issue of custody as a matter of law.

The majority, however, finds our case law to be ambiguous in this area. Specifically, the majority finds that while some Colorado courts have applied a de novo standard when reviewing whether a defendant was "in custody" for purposes of *Miranda*, other Colorado courts have applied a deferential standard. *See* maj. op. at 458–459, comparing *Gennings*, 808 P.2d at 844, 845; *Milhollin*, 751 P.2d at 50–51 with *People v. Trujillo*, 938 P.2d 117, 123 (Colo.1997); *LaFrankie*, 858 P.2d at 706. I do not agree that the cases cited by the majority support the majority's contention that we have applied two different standards of review for determining the issue of custody. Maj. op. at 458–459. Rather than setting out two different standards of review, the cases cited by the majority instead focus on different parts of the deferential standard of review we have consistently applied to custody determinations. This standard of review does involve a de novo review, but only in limited circumstances.

As previously discussed, under our standard of review, we defer to a trial court's ruling if the factual findings are supported by the record and the court fully applied the correct legal standard. Thus, under these circumstances, we apply a deferential standard of review to the issue of custody. However, if we find that the trial court failed to fully apply the correct legal standard, and the factual findings are sufficient and supported by the record, we may conduct a de novo review and decide the issue as a matter of law. Thus, while our standard of review does allow for a de novo review for custody determinations, it is only if the trial court failed to fully apply the correct legal standard.

This standard of review was clearly articulated in *People v. J.D.*, 989 P.2d 762 (Colo. 1999). In *J.D.*, we explained the circumstances under which we could resolve an issue of custody as a matter of law. We stated that:

Where the trial court utilizes the correct legal standard, and its conclusion is supported by evidence in the record, we will not reverse its ruling on appeal.... However, when the trial court fails to fully apply the correct standard ... its ruling cannot stand ... [and] where the findings are sufficient and supported by the record, an appellate court can review the matter and decide the issue as a matter of law.

989 P.2d at 768 (citations omitted). Thus, in *J.D.* we held that if a trial court fully applies the correct legal standard, we will not reverse its ruling. Therefore, we can decide whether a defendant was "in custody" for purposes of *Miranda* as a matter of law only if the trial court failed to fully apply the correct legal standard and the factual findings are sufficient and supported by the record. *J.D.* does not, as the majority suggests, stand for the proposition that a court may apply either a deferential standard or a de novo standard when reviewing "in custody" determinations.

For the reasons stated above, I do not agree with the majority's decision to adopt a de novo standard of review for "in custody" determinations. Thus, in reviewing whether Matheny was "in custody" for *Miranda* purposes, I believe we should adhere to our precedent and apply our more deferential standard of review. Therefore, in this case, we should review the issue of custody to determine whether the trial court failed to fully apply the correct legal standard.

## II.

A review of the record in this case indicates that the trial court articulated the correct legal standard but then failed to fully apply this standard. The trial court stated: "[I]f I apply an objective standard ... I can't see how I can infer anything else other than they intended to arrest him right from the get-go and the minute he walked into the interview room he was not free to leave."

The trial court further stated: "I want it clear for the record that I'm placing heavy emphasis on what I said at the beginning ... and it prevents me from inferring anything other than that they intended to hold Mr. Matheny right from the beginning." Thus, although the trial court expressly stated that it was applying an objective standard, it is clear from the trial court's language that it applied a subjective standard.

In determining whether an individual has been subjected to custodial interrogation, the relevant inquiry is "whether a reasonable person in the suspect's position would consider herself deprived of her freedom of action in a significant way at the time of the interrogation." *People v. Dracon*, 884 P.2d 712, 716–17 (Colo.1994). In arriving at this determination, a trial court must consider the totality of the circumstances surrounding the interrogation. *Id.* at 717. Relevant criteria include the time, place, and purpose of the encounter, the words and demeanor of the officer, and the person's verbal and nonverbal response to any directions given to him by the officer. *People v. Harper*, 726 P.2d 1129, 1131 (Colo.1986).

Because an objective standard applies to the issue of custody, neither the interrogating officer's subjective state of mind nor the suspect's mental state is conclusive on the issue of whether a reasonable person in that situation would have considered the interrogation to be custodial. *People v. Hamilton*, 831 P.2d 1326, 1330 (Colo.1992). However, an officer's knowledge or beliefs may bear upon the custody issue if conveyed, by word or deed, to the individual being questioned. *Stansbury v. California*, 511 U.S. 318, 325, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994). Those beliefs are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his " 'freedom of action.' " *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)). The weight and pertinence of any communications regarding an officer's degree of suspicion will depend upon the facts and circumstances of the particular case. *Id.* Moreover, the mere fact that an interrogation begins as non-custodial

does not prevent the interrogation from later becoming custodial. *See e.g., State v. Augustine*, Nos. IN–91–09–1557, IN–91–19–1558, IN–91–09–1559, IN–91–09–1728, 1992 WL 357873, at *7, 1992 Del.Super. LEXIS 461, at **19–20 (Del.Super.Ct. Oct. 8, 1992)(recognizing that a non-custodial interrogation can become custodial); *Commonwealth v. Medeiros*, 395 Mass. 336, 479 N.E.2d 1371 (1985)(same); *State v. Wiernasz*, 584 N.W.2d 1 (Minn.1998)(same).

After reviewing the videotaped interview, I agree with the majority that Matheny was not "in custody" for purposes of *Miranda* when the interview began. While the purpose of the interview may have been to get Matheny to admit to his involvement in the Dutchers' murders, there is no evidence in the record to suggest that Matheny was aware of this purpose. Thus, under these circumstances, a reasonable person in Matheny's position would not consider himself significantly deprived of his freedom. Therefore, in considering the officers' subjective purpose, the trial erred by applying a subjective standard to the issue of custody. However, the record does support the trial court's application of an objective standard later in the interview because, during the course of the interview, the investigators gradually revealed to Matheny that they believed he was involved in the Dutchers' murders and, eventually, that they believed he was the trigger-man in two of the killings.

Shortly after Matheny recounts the events of the night of the murders, the investigators first reveal to Matheny that Isaac is in custody. They tell him that Isaac has confessed to murdering Tony and that they have no reason to doubt Isaac's story because he knows details that only a person who was at the crime scene would know. In addition, they tell Matheny that Isaac told them that "you [Matheny] provided transportation for him that night," that "he can't get there without assistance," and that "he was there and he was with you [Matheny]." Thus, the interview evolves from Matheny answering questions about his whereabouts on the night of the murders to investigators accusing Matheny of being involved in the murders. Therefore, it becomes clear to Matheny, ear-

ly on in the interview, that the investigators believe he is involved in the murders.

Furthermore, as the interview progresses, an investigator tells Matheny that "if you continue lying to us, you're gonna force us to start making decisions of who gets up at bat first in the process" and that "if you're going to choose to protect those people, well then it tells us that you're the hardest of the bunch ... and the truth is going to be, the hardest don't get deals." The investigator's discussion of "deals" suggests to Matheny he is going to be charged with a crime. When Matheny continues to deny any involvement in the murders, Matheny is finally told that "Isaac says you shot the Dutchers with an AK47."

Because investigators effectively told Matheny, at some point during the course of the interview, of their subjective intent to hold him in custody for murder, this intent becomes relevant in determining whether a reasonable person in Matheny's position would have considered himself deprived of his freedom of action in a significant way. Thus, while Matheny's interview began as non-custodial, at some time during the course of the questioning, it became custodial. However, because the trial court did not make detailed factual findings concerning the communication to Matheny of the investigators' intent to hold him in custody, I would not decide the issue of custody as a matter of law. Instead, I would remand to the trial court with directions to make further factual findings, fully apply an objective standard of law, and thus determine at what point Matheny's non-custodial interrogation became custodial.

Chief Justice MULLARKEY joins in the dissent.